Andrew H. OLSON, Appellee,

v.

NIEMAN'S, LTD., Appellant.

No. 96–1787.

Supreme Court of Iowa.

May 28, 1998.

Rehearing Denied July 13, 1998.

Gene R. La Suer, Kent A. Herink, and Debra Rectenbaugh Pettit of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellant.

Edmund J. Sease, Daniel J. Cosgrove, Heidi Sease Nebel, and Jeffrey D. Harty of Zarley, McKee, Thomte, Voorhees & Sease, Des Moines, for appellee.

Considered by McGIVERIN, C.J., and LARSON, CARTER, LAVORATO, and ANDREASEN, JJ.

LAVORATO, Justice.

A jury awarded Andrew H. Olson $650,000 against Nieman's, Ltd. (Nieman) for the company's alleged misappropriation of Olson's idea, which Olson claims was a trade secret. Nieman appealed and Olson cross-appealed. On the appeal, Nieman raises issues regarding the district court's (1) refusal to extend an expert disclosure deadline, (2) admission of expert testimony on the patentability of Olson's idea, and (3) admission of expert testimony on damages. Nieman also contends insufficient evidence supported the jury's verdict for Olson on his breach-of-contract and misappropriation-of-trade-secret claims.

On the cross-appeal, Olson raises issues regarding the district court's (1) refusal to award him exemplary damages and attorney fees, (2) submission of a supplemental special interrogatory regarding allocation of the damages award among Olson's three theories of action, and (3) setting aside a verdict on his misappropriation-of-intellectual-property claim.

We affirm on the appeal and cross-appeal.

## I. *Facts.*

Olson developed an idea for "breakaway hazard lights." He envisioned a device that would activate flashing lights on a trailer if the trailer disengaged from the transporting vehicle.

In May 1992 Olson built a prototype of the breakaway hazard lights. He also drew a schematic diagram showing how the device would work. Olson then contacted Nieman to see if the company was interested in his idea. Olson and Nieman agreed in writing that Olson would disclose his schematic drawing to Nieman and Nieman would keep "all technical information related to the design and use" of the device confidential.

Nieman sought out an independent electrical engineer, Dale Sloan, to incorporate the device into its existing system and provided Sloan with the schematic drawing so he could

do so. Sloan agreed to keep the schematic drawing confidential.

Sloan thought that Olson's device did not function properly with Nieman's breakaway braking system. Sloan believed, however, he could develop a device that would work with the Nieman system.

Nieman and Olson failed to reach an agreement regarding Olson's compensation for his device. In October 1992 Nieman wrote Olson telling him that "[w]e have found it necessary to decline working with you due to your requirements financially."

A month later at a trade show, Nieman demonstrated and distributed literature describing Sloan's implementation of Olson's idea. The demonstration model malfunctioned and Nieman ceased to display it.

In December, via a confidentiality agreement, Olson agreed to disclose his idea to Tekonsha, a Nieman competitor. After receiving the confidentiality agreement and Olson's idea, Tekonsha informed Olson that Nieman had been using a flasher system employing "the exact idea which you have disclosed." Following a telephone conversation with a Tekonsha employee, Olson learned of Nieman's display at the trade show a month earlier.

## II. *Proceedings.*

Once he learned Nieman had publicly displayed the device, Olson filed suit against Nieman. The suit alleged breach of contract, conversion of intellectual property, wrongful misappropriation of trade secrets pursuant to Iowa Code chapter 550 (1993), and common-law misappropriation of intellectual property.

The district court set a February 6, 1996 deadline for Nieman to disclose any expert witnesses. In April 1996 Nieman moved to extend the expert witness disclosure deadline. Nieman sought to include an additional patent expert, Laramie E. Asken.

The district court denied the motion because it found no good cause for the late disclosure, noting that Nieman had been in contact with Asken since June 1994. The court also noted that such a late filing would prejudice Olson.

The case proceeded to trial during which the district court, over Nieman's objections, admitted testimony from two of Olson's experts. One expert testified about the patentability of Olson's idea. The other testified about damages Olson allegedly suffered because of Nieman's disclosure of Olson's device.

Olson displayed his device to the jury. The device worked as he said it would.

The district court overruled Nieman's motion for directed verdict at the close of Olson's evidence and again at the close of all the evidence. The court then submitted three theories of recovery: breach of contract, misappropriation of a trade secret, and misappropriation of intellectual property. The jury answered interrogatories, finding that Olson proved all three theories. The jury also answered a special interrogatory, finding that Nieman's misappropriation of Olson's trade secret was "willful and malicious." In addition, the jury answered an interrogatory, finding the damages to be $650,000.

Over Olson's objection, the district court then submitted a supplemental special interrogatory that would allow the jury to allocate the $650,000 among Olson's three theories. The jury apportioned all of the $650,000 to Olson's misappropriation-of-trade-secret claim.

Nieman then moved for a judgment notwithstanding the verdict or, in the alternative, for new trial. Later, the court overruled Nieman's motions. The court, however, did set aside the verdict for misappropriation of intellectual property, concluding that such a theory "is not recognized as a viable cause of action in Iowa."

In addition, the court denied Olson's motion for exemplary damages and attorney fees pursuant to Iowa Code sections 554.4(2) and 550.6(3).

Nieman appealed and Olson cross-appealed.

## III. *Issues on Appeal.*

■ A. *Failure to extend expert disclosure deadline.* Nieman first contends the district court abused its discretion by refus-

ing to extend the time in which it could disclose its expert witness on patentability, Laramie E. Asken. Nieman argues that it had good cause to disclose Asken two months after the disclosure deadline because of the complexity and time consuming nature of patent searches and because of the issue's vital importance to Olson's damages claim. Nieman insists that Olson would have suffered no prejudice from the late disclosure because Nieman had claimed the existence of prior art in its original expert witness disclosure.

On August 24, 1995, the district court entered a pretrial conference scheduling order pursuant to Iowa Rule of Civil Procedure 136, setting the following deadlines for disclosure of expert witnesses: Olson's by January 2, 1996; and Nieman's by February 6, 1996. In addition, the order set March 15, 1996, as the deadline for discovery and May 29, 1996, as the trial date. Counsel for both parties participated in the pretrial conference.

One month before this order, Nieman filed a designation of expert witnesses listing three experts. Asken was not among them. Nieman also noted, "Defendant will supplement this list of expert witnesses, as may, from time to time, be required." Nieman's request to include Asken as an expert witness was not, however, filed until April 9, 1996, two months past the February 6, 1996 disclosure deadline.

Iowa Rule of Civil Procedure 136(b)(3) allows a district court to enter a scheduling order setting time limits for completing discovery. Iowa Rule of Civil Procedure 138 mandates that

> [a]fter any conference held pursuant to R.C.P. 136, an order shall be entered reciting the action taken. This order shall control the subsequent course of the action unless modified by a subsequent order.

Iowa Rule of Civil Procedure 136(e) provides that if a party or a party's attorney fails to obey a scheduling or pretrial order, the court on its own initiative "may make such orders with regard thereto as are just."

The district court was well within its broad discretion to deny Nieman's request to extend the expert disclosure deadline. *See*

*Sullivan v. Chicago & Northwestern Transp. Co.*, 326 N.W.2d 320, 324 (Iowa 1982) (holding that imposition of discovery sanctions is discretionary and will not be disturbed unless there has been an abuse of discretion). We say this because Nieman violated the pretrial order on disclosure of experts, and the district court gave cogent reasons for the denial:

It is clear from the record that Defendant's counsel and Asken had been in contact for a substantial period of time going back at least to June 23, 1994. Contacts between counsel and Asken continued in cumulative fashion, i.e. Asken's opinion modified as the quantum of material researched by him expanded. The nature and extent of his present position appears based upon this expanded data.

The pretrial conference order fixed a discovery deadline of March 15, 1996. Both parties' counsel acknowledged additional discovery would be required in regard to Asken's qualifications, conclusions and basis therefor. Asken resides in Washington, D.C. Travel arrangements would be necessitated and travel time involved. This case is (and has since August 24, 1995) been set for trial on May 29, 1996. As demonstrated by numerous amendatory addenda, Asken's testimony has become progressively detailed. Plaintiff contends the post-deadline inclusion of Asken would be prejudicial as well as untimely. Having reviewed the various affidavits, the Court concurs.

The Court concludes no good cause has been shown for failure to adhere to the disclosure of expert witness deadline of February 6, 1996, as well as the established discovery deadline of March 15, 1996.

■ Contrary to Nieman's contention, Iowa Rule of Civil Procedure 125(c) provides no relief. Rule 125(c) requires a party to supplement discovery as to experts "as soon as practicable, but in no event less than thirty days prior to the beginning of trial except on leave of court." While it is true Nieman filed its supplemental discovery as to Asken before the thirty-day period before the trial, rule 136 gives the district court power to impose scheduling orders with al-

ternative time limits. In short, rule 136 trumps rule 125(c).

The rule 136 power to impose scheduling orders with alternative time limits is especially important in complex cases like this one. Designating an expert witness thirty days before trial may cause extreme prejudice to the opposing party, who then may be compelled to depose the expert and obtain experts to refute the proffered testimony. In these circumstances, the district court may then be compelled to allow a continuance of a trial that may have been set months previously.

In this case, depriving Nieman of Asken's testimony was not as damaging to Nieman's defense as Nieman contends. Asken was going to testify to numerous patents that he believed included Olson's idea and therefore constituted "prior art." The district court admitted the evidence, and Nieman was able to use it to bolster its defense that Olson's idea was not novel.

The district court did not abuse its discretion when it denied Nieman's request to extend the expert disclosure deadline.

**B.** *Expert testimony: patentability.*
At trial, Alan Harms testified as an expert on behalf of Olson. Nieman contends there was insufficient evidence to support Harms' opinion about the patentability of Olson's device.

Nieman raises two complaints regarding Harms' testimony: (1) Olson did not make a patent claim upon which to base Harms' opinion of patentability, and (2) Harms' testimony did not establish that Olson's idea was nonobvious as the patent laws require. Harms' testimony, Nieman strenuously argues, was prejudicial because Olson's damages expert relied on patent royalties in calculating Olson's alleged damages.

Iowa Rule of Evidence 702 governs admissibility of expert testimony:

If scientific, technical, or other specialized knowledge will *assist the trier of fact to understand the evidence or to determine a fact in issue,* a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. (Emphasis added.)

As the italicized language indicates, a threshold requirement for the admissibility of expert testimony is that the testimony must aid the trier of fact to resolve a disputed issue. *Williams v. Hedican,* 561 N.W.2d 817, 822–23 (Iowa 1997). If such testimony is to aid the trier of fact, it must be reliable. *Id.* at 823. If the testimony is not reliable, it certainly cannot aid the trier of fact. *Id.* The amount of foundation necessary to establish reliability depends on the complexity of the evidence and the likely impact of the evidence on the trier of fact. *Id.* In applying these requirements, we follow a liberal rule of admissibility. *Id.* at 822.

There is no claim that Harms was not qualified under Rule 702 to render an opinion on the facts underlying patentability. We are not surprised because Harms is a patent attorney who has years of experience prosecuting patents through the United States Patent and Trademark Office.

We therefore restrict our discussion to whether Harms' testimony assisted the jury in evaluating prior art patents and their impact upon the patentability of Olson's device. We do so within the parameters of Nieman's objections to Harms' testimony.

**1.** *Olson's failure to make a patent claim.* Nieman points out that a patent claim is analogous to the legal description of a deed: The claim sets out the scope of the invention. The patent law requires that the patent application include "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 (1994). Without a proper description of the device, the Patent Office cannot determine whether the device is new, useful, and nonobvious—the requirements for patentability. *Id.* §§ 101, 103.

Based on the cited patent laws, Nieman insists that the patentability of a purported invention and the damages resulting from the destruction of the invention's potential patent rights can only be determined with respect to a claimed invention. Thus, Nieman con-

tends, Olson was required to at least submit a proposed claim. Without such a claim, Nieman concludes, the jury (1) could not make a fair determination of whether Olson's device was new, useful, and nonobvious, and (2) was left to guess as to whether the device was patentable.

We think Olson is correct in distinguishing this case from a patent infringement action where a challenged device conflicts with a patent and thereby causes damages to the patent holder. Here, patentability is inextricably intertwined with the damages issue because Olson is claiming that Nieman destroyed his ability to obtain a patent. By destroying Olson's ability to obtain a patent, Nieman necessarily destroyed Olson's ability to make a formalized claim.

Because Olson could not make a formalized claim against which the prior art could be evaluated, Olson contends Harms did the next best thing. Harms developed what he thought, as a patent expert, was the best definition of Olson's idea and what, to laypersons, would seem a reasonable embodiment of what the claim would have been if not destroyed—the idea and the schematic drawing.

Harms then evaluated each of the patents found in Nieman's three patent searches against his description of Olson's idea: a breakaway switch that sensed the separation of a trailer from a towing vehicle and in response to the separation energized a flasher that caused trailer lights to flash. Harms further testified that none of the patents in evidence affected the patentability of Olson's idea. Harms ultimately testified that Olson's device was patentable.

Olson's damages expert based his opinions on the patentability of Olson's device. Expert testimony on patentability was therefore essential. If Harms' testimony was reliable, it would certainly aid the jury on the patentability issue.

The district court made a judgment call that Harms' testimony was reliable and therefore an aid to the jury on the patentability issue. We think Harms' methodology in reaching his opinion on patentability was reasonable and therefore reliable. We see nothing in Harms' testimony requiring us to disturb the district court's decision. *See De-Burkarte v. Louvar,* 393 N.W.2d 131, 138 (Iowa 1986) (holding that admission of expert testimony rests in discretion of district court and appellate court will not reverse absent abuse of discretion).

2. *Nonobviousness.* 35 U.S.C. § 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

■ Nieman correctly points out that under this statute nonobviousness is one of the three criteria for patentability. *Graham v. John Deere Co.,* 383 U.S. 1, 12–14, 86 S.Ct. 684, 691–92, 15 L.Ed.2d 545, 553–54 (1966). The question boils down to whether the invention as a whole would not have been obvious to one of ordinary skill in the art at the time the device was made. *Id.* at 14, 86 S.Ct. at 692, 15 L.Ed.2d at 554.

■ Whether a device is nonobvious is a conclusion of law based upon fact determinations. *Id.* at 17–18, 86 S.Ct. at 694, 15 L.Ed.2d at 556; *Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 695 (Fed.Cir.1983). The fact determinations are (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill in the pertinent art, and (4) additional evidence that may serve as indicia of nonobviousness. *Environmental Designs,* 713 F.2d at 695. There are also secondary considerations that are relevant on the question of nonobviousness: commercial success, long felt but unresolved needs, and failure of others. *Id.*

Nieman simply contends no evidence was presented to support the four fact determinations for nonobviousness and very little evi-

dence was presented on the secondary considerations. We disagree.

■ As to the scope and content of the prior art, we mentioned earlier that Harms compared all of the patents found in Nieman's three patent searches against Harms' description of Olson's idea. The patents constituted what Nieman believed was the prior art. Prior art in the form of patents is a necessary method of establishing patentability. See 35 U.S.C. § 103. Although Harms did not conduct his own search, the jury could reasonably find that the patents constituted the prior art against which Olson's idea had to be compared. Contrary to Nieman's contention, the fact that Harms made no search of his own did not affect the admissibility of his testimony. Rather, such failure went to the weight of the testimony.

As to the differences between the prior art and Olson's idea, Harms found none of the patents in evidence affected the patentability of Olson's idea. Two of the patents included the Jones and Bhushan patents—the two Nieman considered most pertinent. Thus, Harms was saying that none of the prior art destroyed the novelty of Olson's idea and did not render his idea obvious to one skilled in the art.

In the following testimony, Harms considered the level of ordinary skill in the pertinent art:

Q. I would like you to assume that the evidence in this case shows that Tekonsha Engineering, acting through its Director of Engineering Marcia Albright, evaluated Andrew Olson's [schematic drawing] and after making that examination that Tekonsha Engineering characterized his idea as a good idea, that the implementation of it is straight forward. Would that sort of evidence be of any significance to the United States Patent and Trademark Office in evaluating the patentability of Mr. Olson's idea? A. Why, I think so because one of the tests is whether it's obvious to persons with ordinary skill and technology and the director of engineering in a company that builds trailer parts would certainly seem to be that person with that ordinary skill or reasonable skill in this technology.

Q. And of what significance is it that a person who's the director of engineering of a manufacturer of breakaway switches called the idea a good idea, the implementation of which is straight forward? A. Well, it would seem like an acknowledgment that it's new and that it's not obvious.

Q. And is that information in your experience relevant for examiners before the United States Patent and Trademark Office to consider? A. Yes.

Nieman's own literature about Olson's idea corroborated Harms' testimony by describing the idea as a "Revolutionary New Warning Device That Turns On Your Rear Stop Light and Flashing Light." In addition, a letter to Olson from Nieman acknowledged that Olson had "the rights to a very valuable invention." The engineering department of a firm Olson had originally contacted about his idea responded: "Your invention is a simple and effective one. I believe it may become required someday." The firm suggested Olson should contact Nieman because "your idea would fit in very well with their idea" of a breakaway battery system.

These statements bear not only on the level-of-ordinary-skill element but they constitute additional evidence serving as indicia of nonobviousness. We think there was sufficient evidence from which the jury could reasonably find that Olson's idea as a whole would not have been obvious, at the time he conceived it, to one of ordinary skill in the art.

C. *Expert testimony: damages.* Nieman also challenges the testimony given by Olson's damages expert, Wayne Newkirk. The challenge is two-pronged: Newkirk lacked the qualifications necessary to give his opinion on damages, and his damages calculations were speculative.

■ 1. *Qualifications.* Nieman claims Newkirk is not an expert on the recreational vehicle industry, trailer safety, or any other field that would allow him to specifically opine as to the potential sales for a breakaway hazard device. Thus, Nieman concludes, Newkirk lacks the qualifications necessary to testify as an expert witness.

Iowa Rule of Evidence 702 allows a "witness *qualified as an expert by knowledge, skill, experience, training, or education* [to] testify ... in the form of an opinion or otherwise" as to "scientific, technical, or other specialized knowledge [provided such knowledge] will assist the trier of fact to understand the evidence or to determine a fact in issue." (Emphasis added.)

 Whether a witness is qualified to give expert testimony lies within the discretion of the district court. We will not reverse its decision absent an abuse of that discretion and prejudice to the complaining party. *Hyler v. Garner*, 548 N.W.2d 864, 868 (Iowa 1996). Moreover, the source of expert knowledge is not significant. *DeBurkarte*, 393 N.W.2d at 138 (holding that physician need not be specialist in particular field of medicine to give expert testimony).

Newkirk has a bachelor of science degree, a master's degree, and a doctorate, all in the field of economics. He also has a law degree. Newkirk is and has been a full professor in economics since 1972. He does consulting work, most notably valuing intellectual property such as trademarks, trade secrets, copyrights, and patents, and has testified as an expert witness in numerous cases.

Newkirk testified that in preparing for his testimony he studied reports concerning the sales of recreational vehicles in the United States. The reports were prepared by the Recreation Vehicle Industry Association. He also studied Nieman's sales information regarding breakaway kits. The district court put the issue of Newkirk's qualifications in proper perspective: "I recognize the fact that challenging Dr. Newkirk as an expert is sort of like flying in the face of motherhood with a flag and in a rocking chair with apple pie."

We think Newkirk was qualified to testify regarding damages, and, more specifically, regarding the potential sales for a breakaway hazard device. Any deficiencies in his background such as lack of experience with the recreational vehicle industry go to the weight of his testimony rather than to its admissibility. *See Hutchison v. American Family Mut. Ins. Co.*, 514 N.W.2d 882, 885 (Iowa 1994) (holding that if witness has threshold qualifications to testify as an expert, any inquiry concerning the extent of his qualifications goes to the weight of his testimony and not to its admissibility).

**2. Damages calculations.** The closer question is whether there was a reasonable basis for Newkirk's damages calculations. Nieman contends there was not such a reasonable basis because Newkirk made three assumptions having no support in the evidence. In short, Nieman characterizes Newkirk's testimony as pure "speculation and guess-work." Newkirk assumed (1) the relevant market was recreational vehicles, (2) in the first year Olson would sell the devices manufactured by Nieman to 10% of the recreational vehicle market, and (3) a steady increase in the percentage of sales over the seventeen-year life of the would-be patent.

 There is a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages. *Orkin Exterminating Co. v. Burnett*, 160 N.W.2d 427, 430 (Iowa 1968). Damages are denied where the evidence is speculative and uncertain whether damages have been sustained. *Id.* But "[if] the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated." *Id.*

 Thus, some speculation is acceptable. On this point, we have noted that "[w]hile it may be hard to ascertain ... a loss with preciseness and certainty, the wronged party should not be penalized because of that difficulty." *Bangert v. Osceola County*, 456 N.W.2d 183, 190 (Iowa 1990). In addition, if an expert makes some flawed assumptions in testifying, that fact goes to the weight to be given the opinion, not to its admissibility. *Preferred Mktg. Assocs. v. Hawkeye Nat'l Life Ins. Co.*, 452 N.W.2d 389, 393 (Iowa 1990). On the other hand, overly speculative damages cannot be recovered. *Jamison v. Knosby*, 423 N.W.2d 2, 6 (Iowa 1988).

Courts and commentators have noted that trade secret valuation is particularly difficult:

[A]lthough the burden to prove damages is upon the plaintiff, where there are damages which cannot be ascertained with reasonable certainty under the standard formulas for measure of damages, establishing a rule of damages for the case rests in the sound discretion of the trier of fact, based upon the best evidence available.

12A Roger M. Milgrim, *Business Organizations: Milgrim on Trade Secrets* § 7.08[3][c], at 7–247 (1984) [hereinafter *Milgrim*]. This court has previously allowed damages for lost profits based on a market analysis in a common-law trade secret misappropriation case. *Basic Chems. Inc. v. Benson*, 251 N.W.2d 220, 233 (Iowa 1977). The court noted that the process the district court used was a "reasonable basis from which the amount of damages can be inferred or approximated." *Id.*

Given the difficulty of assessing damages in trade secret cases, courts have frequently analogized damages in a trade secret action to those measures of damages usually employed in patent infringement cases:

Despite the fact that patent infringement and trade secret misappropriation are distinct wrongs, the courts tend to apply what is essentially a patent standard of damages, referring to either defendant's profits or plaintiff's losses. Occasionally courts grant as damages "reasonable royalties," another patent-tied measure. It has been suggested that reasonable royalty is a measure suitable only to cases where defendant has made no profit and plaintiff is unable to establish a loss. Reasonable royalties need not be limited to *rate* of any royalty; a forfeitary royalty could be established by the trier of fact on the basis of the value of the wrongfully appropriated subject matter. Of course in some cases the defendant may not have realized a profit; in such event, defendant's revenues and plaintiff's probable profits on such revenues might be the measure.

*Milgrim* § 7.08[3][b], at 7–235 to 7–239.

■ Reasonable royalty, as presently understood in patent cases, is "simply that amount which the trier of facts estimates a person desiring to use a patent right would be willing to pay for its use and a patent owner desiring to license the patent would be willing to accept." *University Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 537 n. 31 (5th Cir.1974). Thus, if the plaintiff cannot show an established rate of royalty, the plaintiff may

permissibl[y] show the value of what has been taken by the infringement by proving what would have been a reasonable royalty, considering the nature of the invention, its utility and advantages, and the extent of the use involved. What is a reasonable royalty is a question of fact.... The primary inquiry, often complicated by secondary ones, is what the parties would have agreed upon, if both were reasonably trying to reach an agreement.

There is no mathematical formula for the determination of a reasonable royalty. The property loss of a patentee from infringement may arise from such varying facts and circumstances that each case must be controlled by those peculiar to it and except in rare instances the loss can only be determined by reasonable approximation.

*Faulkner v. Gibbs*, 199 F.2d 635, 639–40 (9th Cir.1952).

Iowa Code chapter 550—Trade Secrets— recognizes reasonable royalty as a measure of damages: "In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a *reasonable royalty* for a person's unauthorized disclosure or use of a trade secret." Iowa Code § 550.4(1) (emphasis added).

■ Determining a reasonable royalty is analogous to a jury's determination of a proper amount of damages for pain and suffering in a personal injury suit. Like reasonable royalties, pain and suffering cannot be measured by any exact mathematical formula. *Oldsen v. Jarvis*, 159 N.W.2d 431, 434 (Iowa 1968). Rather, pain and suffering rest in the sound discretion of the jury based upon a fair and impartial consideration of all the evidence. *Id.*

■ Such flexibility in determining a reasonable royalty is imperative in cases involving business torts such as misappropriation of trade secrets. This is because "[p]ublic policy requires that unfair competitors must not be allowed to profit by their wrongful methods and that those who have been injured by them should receive adequate compensation for the loss or injury they have suffered." *Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 385 N.E.2d 1349, 1356 (1979) (quoting 2 H. Nims, *Unfair Competition and Trade–Marks* § 419, at 1324–25 (4th ed.1947)). This is especially important where (1) a defendant has destroyed the value of plaintiff's secret through publication and has not enjoyed any profits and (2) the plaintiff is hard-pressed to show any loss. *University Computing Co.*, 504 F.2d at 535.

■ Here, Newkirk developed four models to calculate damages, using a reasonable royalty measure of damages and a market approach. Under the circumstances, this was appropriate because from the evidence the jury could find (1) Nieman destroyed the value of Olson's device by making it public; (2) Nieman sold few, if any, devices; and (3) Olson derived no income from it. Thus, Newkirk was attempting to value the lost opportunity of a destroyed right.

■ Newkirk's calculation of damages not only assumes a market for Olson's device but also a profitable one. His assumptions are reasonable because they are based on (1) Harms' testimony that the device was patentable and (2) statements Nieman's competitors made that there would be a demand for the device.

In a preface to his damage report, entitled "Principles of Valuation," Newkirk describes the market approach: "The market approach measures the present value of future benefits by determining the value that market would accord to the investment. Market analysis requires a *public market* and the existence of comparable values." He testified this method is a highly recognized economic valuation technique for market valuation of intellectual property and intangible assets. *See generally* Gordon V. Smith & Russell L. Parr, *Valuation of Intellectual Property and Intangible Assets* ch. 7, 8 (1989). One commentator has noted that lost profits is the "primary component in measuring [the plaintiff's] loss." David G. Oberdick, Comment, *The Taking of Trade Secrets: What Constitutes Just Compensation?*, 48 U. Pitt. L.Rev. 247, 264 (1986).

Newkirk assumed the relevant or likely market was recreational vehicles. He testified this was a conservative approach because besides the recreational vehicle market, Nieman sold its breakaway kits in a variety of trailer markets. The evidence shows that Nieman chose the recreational vehicle market as the relevant one when it decided to market the model Sloan developed from Olson's schematic drawing at the November 1992 recreational vehicle trade show.

For his opinions, Newkirk relied in part on reports prepared by the Recreational Vehicle Industry Association. The reports were based on sales data for the industry going back ten years. Based on these reports, Newkirk first projected estimated sales of towable recreational vehicle units over the seventeen-year life of the would-be patent. He testified experts rely on these kinds of sources in valuating intellectual property. *See* Iowa R. Evid. 703 (providing that data an expert uses in forming opinion need not be admissible in evidence "[i]f of a type reasonably relied upon by experts in the particular field").

The different models assume a different number of devices sold, beginning with 10% of breakaway brake units sold. The models also assume an increase in sales at 5% per year.

Newkirk premised the 5% yearly increase in sales on (1) a 7% average annual increase in sales of towed vehicles over the past ten years in the recreational vehicle industry, (2) his belief that consumers would see the value of Olson's device in terms of safety, and (3) the "baby boomer" generation reaching retirement during the next fifteen years. As for the "baby boomers," Newkirk pointed out that

[o]ne of the major factors in this market, of course, is that we are now just reaching the point when the first year of baby boomers has reached the age of fifty and

the prime market for recreational vehicles is for persons between forty-five and fifty-six and so every year for the next fifteen years we're going to have an increase in the number of persons who would be eligible customers for recreational vehicles and so the recreational vehicle market is looking forward with great optimism in terms of these kinds of numbers.

When asked how he derived this information, Newkirk responded:

Well, the information, of course, is not only referred to in terms of documents of recreational vehicles but the fact of the increase in the population as this group of persons beginning in 1945 and ending in 1958 moved through the—moved through the distribution of the population just as they have. For example, in the case of colleges where back in the 1960s and 1970s where you could hardly get into schools, today, of course, it's just the reverse. So you have the age population moving through and so the same thing is going to happen in terms of recreational vehicle industry and other industries as people who are—represent a consumer household, mainly two people working in the house are going to be candidates for purchases of recreational vehicles and so this will continue until this particular age group moves through the entire sequence of the population over the next fifteen years.

The models assume a 5% or 10% royalty rate on a patent. Newkirk testified that a 5% royalty is within the bounds of negotiated royalties in cases similar to this one. He also testified 5% was the rate Olson indicated he was willing to accept when he was negotiating with Nieman.

Newkirk used a selling price of $20 per device in all four models. He based that on Nieman's own pricing of the device at $18.68 at the November 1992 recreational vehicle trade show. Newkirk testified the $1.32 difference in price reflected what he thought would be the price increase from November 1992, when Nieman first priced the device, until trial in 1996.

Newkirk reduced to present worth the royalty income in all four models, using a 19.4% discount rate. He testified that the normal

rate of return for publicly held corporations was 14.4%. He added an additional 5% to reflect the market risk for the device. The calculations produced damages of $672,270 for Model I, $1,344,540 for Model II, $934,085 for Model III, and $1,868,171 for Model IV.

Apparently, the jury found Model I the most reliable because it returned a verdict of $650,000, which is closest to the $672,270 proposed in Model I. Thus, the jury awarded $22,000 less than the damages proposed in Model I, the most conservative of the four models. Model I projects a smaller increase in sales and uses a 5% royalty rate.

■ Although Model I is somewhat speculative, it is not overly so. Our discussion of Newkirk's testimony amply demonstrates a reasonable basis in the record for the damages awarded. Although Newkirk made assumptions about (1) the relevant market, (2) the initial sale to 10% of the market, and (3) a steady increase in sales over the life of the would-be patent, he relied on recreational vehicle industry reports for those assumptions. Nieman exploited any uncertainty about these assumptions by vigorous cross-examination. Any such uncertainty went to the weight of Newkirk's testimony, not to its admissibility.

Given the fact that Olson's trade secret was destroyed before anyone could ever realize any profit on it, his damages were not susceptible to an exact mathematical formula. Olson presented the best evidence available on damages, and the jury in its discretion returned a verdict within the parameters of that evidence.

We note that the damages evidence here was no more speculative than that in a case we recently decided involving retaliatory discharge. *See Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 688 (Iowa 1990). In *Smith* we reversed a trial court's refusal to submit future damages. *Id.* at 687–88. We recognized that such damages in an at-will employment are somewhat speculative because "it is often difficult, if not impossible, to know how long the employee would have continued to work for the employer." *Id.* at 688. Nevertheless, we remanded on the question of lost future wages.

*Id.* We held that the plaintiff would be entitled to such damages "if the jury concludes from the evidence [the plaintiff] would have been employed by [the defendant] subsequent to the date of trial had it not been for the workers' compensation claim." *Id.* We then went on to say "[t]he jury must then determine the likely duration of [the plaintiff's] employment [with the defendant]." *Id.* The difference between the plaintiff's wages with the defendant-employer and the present employer reduced to present value would be the amount of the award. *Id.*

We allowed the plaintiff considerable leeway on the question of speculation because preclusion of future damages would allow the defendant-employer's liability for its unlawful action to end at the time of judgment. *Id.* As mentioned, courts likewise allow considerable leeway on speculation involving damages in trade secret misappropriation cases to prevent unfair competitors from profiting by their wrong-doing. The legislature has implicitly approved such leeway by allowing use of a reasonable royalty measure of damages "[i]n lieu of damages measured by any other methods." Iowa Code § 550.4(1).

We conclude the district court did not abuse its discretion in allowing Newkirk's testimony on damages.

**D.** *Sufficiency of the evidence: misappropriation of a trade secret.* Nieman's final contention is that Olson failed to present sufficient evidence to support a verdict against Nieman for misappropriation of a trade secret. For that reason, Nieman argues, the district court erred in not sustaining its motions for directed verdict and judgment notwithstanding the verdict.

Our review is for correction of errors at law. Iowa R.App. P. 4.

In considering the grounds for these motions, we view the evidence in accordance with the same principles that guide the district court in its review. *Smith*, 464 N.W.2d at 684. The standard is whether there is sufficient evidence to submit a party's claim to the jury. *Id.*

In making this determination, we, like the district court, must view the evidence in the light most favorable to the party against whom the motions were made. *Id.* If substantial evidence supports each of the elements of the plaintiff's claim, the district court should deny the motions. *Id.* Conversely, if there is no such substantial evidence, a directed verdict or judgment notwithstanding the verdict in the defendant's favor is appropriate. *Id.* "Evidence is substantial if reasonable minds could accept it as adequate to reach the same findings." *Tim O'Neill Chevrolet, Inc. v. Forristall,* 551 N.W.2d 611, 614 (Iowa 1996).

**1.** *Trade secret.* Olson's action for misappropriation of a trade secret arose under Iowa Code chapter 550, which defines a trade secret as:

> [I]nformation, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:
>
> a. Derives independent economic value, actual or *potential,* from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Iowa Code § 550.2(4) (emphasis added).

Nieman argues that Olson's device was generally known and readily ascertainable by proper means and was not economically valuable from not being generally known. Nieman argues further that Olson did not make reasonable efforts to maintain secrecy.

**a.** *Not being generally known and readily ascertainable by proper means.* To show that Olson's device was generally known, Nieman relies upon prior art in the form of the patents previously referred to in our discussion of Harms' testimony. As mentioned, the district court did not abuse its discretion in allowing Harms' testimony regarding the patentability of Olson's device. Harms testified Olson's device would not have been obvious to one of ordinary skill in the art—the necessary elements for patentability. He opined that Olson's device was patentable. In reaching that conclusion,

Harms found none of the patents in evidence destroyed the novelty of Olson's device. This testimony was substantial evidence that Olson's device was not *generally* known and readily ascertainable by proper means.

■ **b.** *Economic value from not being generally known.* Nieman also contends that Olson's device did not obtain economic value from not being generally known. In support of its contention, Nieman argues that the device could have been reverse engineered by competitors as soon as it was produced, and therefore it would not have remained secret.

■ "Economic value" in section 550.2(4)(a) means "value of the information to either the owner or a competitor; any information which protects the owner's competitive edge or advantage." *U.S. West Communications, Inc. v. Office of Consumer Advocate,* 498 N.W.2d 711, 714 (Iowa 1993). Although Olson's device could be reverse engineered once placed on the market, this fact ignores substantial record evidence that Olson's device could have brought him economic value *before its release on the market. See* Iowa Code § 550.2(4)(a) ("[d]erives independent economic value, actual or *potential,* from not being generally known ... and not being readily ascertainable by proper means") (emphasis added); *Milgrim* § 2.05[4], at 2–53 ("A clear distinction should be drawn between a trade secret which *will* be disclosed if and when the product in which it is embodied is placed on sale, and a 'trade secret' embodied in a product which has been placed on sale, which product admits of discovery of the 'secret' upon inspection, analysis, or reverse engineering.").

The jury could find from the evidence that Olson had several economic options, provided his idea remained secret: He could (1) sell the idea to a manufacturer for a flat fee or for royalties, or (2) patent the device. There is evidence that manufacturers, including Nieman, were interested in his device. There was also Harms' testimony that Olson's idea was patentable before Nieman publicly disclosed it. The jury could easily find that Olson's idea had potential, independent economic value if it were kept secret until Olson could exercise his several economic options.

■ **c.** *Reasonable efforts to maintain secrecy.* Nieman claims that Olson's efforts to preserve any secrecy of the written schematic were not reasonable under the circumstances. In support of this claim, Nieman points out that Olson sent a copy of the schematic diagram to Hayes Axles, Inc. about the same time that he sent a copy to Nieman. Olson entered into a confidentiality agreement with Hayes Axles, Inc., which required Olson to mark any confidential information with an appropriate legend, marking, stamp, or other positive written identification. Nieman contends Olson failed to appropriately mark as confidential any of the information he sent to Hayes Axles, Inc.

Before sending the agreement and schematic drawing to Hayes Axles, Inc., Olson marked the drawing with the word "inventor," intending this as an appropriate legend of confidentiality. There was no evidence that Hayes Axles, Inc. did not consider the drawing confidential. Nor was there any evidence that Hayes Axles, Inc. ever disclosed the information to third parties. We agree with the district court all of this evidence generated a jury question on the reasonable-efforts-to-preserve-secrecy issue.

■ **2.** *Misappropriation.* Nieman insists there was no misappropriation, even assuming Olson possessed a trade secret. Iowa Code section 550.2(3) defines "misappropriation" to include the following:

d. Disclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

e. Disclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is derived from or through a person who owes a duty to maintain the trade secret's secrecy or limit its use.

Nieman does not dispute that the confidentiality contract imposed a fiduciary duty on it not to disclose technical information related to Olson's device. Contrary to Olson's con-

tention, Nieman asserts that it did not "use" or "disclose" any "confidential information" by displaying a model and distributing brochures at the November 1992 trade show. Nieman cites two reasons for this assertion: (1) the model did not exactly replicate Olson's diagram, and (2) the model's circuitry was concealed in a box and the literature did not show Olson's diagram.

Olson responds that testimony from Nieman's employees contradicts Nieman's claim that it disclosed a different device at the trade show.

Even assuming the model Nieman showed at the trade show did not *exactly* replicate Olson's device, the evidence shows Sloan developed it based on Olson's diagram. That fact belies Nieman's claim that Sloan came up with a totally original device independent of Olson's diagram. In these circumstances, Nieman's minor modifications do not insulate the company from liability for wrongful use of Olson's device. *See Milgrim* § 7.07[1], at 7–164. The jury could reasonably find Nieman was displaying a model substantially similar to Olson's device, or, at the very least, a model based on Olson's diagram.

Contrary to Nieman's second contention that it did not "use" or "disclose" any confidential information, there was uncontroverted evidence that Nieman displayed the device at the November 1992 trade show, distributed brochures describing the device, and even offered it for sale. Olson knew nothing about these actions.

Shortly before the trade show, Nieman terminated its relationship with Olson. Shortly after the trade show, Olson entered into a confidentiality agreement with Tekonsha, a Nieman competitor. After Olson disclosed the schematic diagram to Tekonsha pursuant to the agreement, the director of engineering for Tekonsha wrote Olson a letter in January 1993, stating that "another vendor does employ the exact idea which you have disclosed. The other vendor (Nieman) has utilized the flasher system for around six months." Olson called the writer of the letter who informed Olson that she had seen a brochure from the November 1992 trade show.

The jury could reasonably find from this evidence that Nieman used or disclosed Olson's trade secret and by its actions placed it within the public domain. As one commentator has noted:

> [I]t is an almost undisputed proposition that when an article, the "secret" nature of which is fathomable upon scrutiny and inspection, is marketed, the "secret" is lost. The same rule is applicable when the article is put on display in such a manner as to allow its secret to be known. Similarly, a trade secret may be lost through disclosure occurring in advertising, trade circulars, or in an analogous manner.

*Milgrim* § 2.05[2], at 2–38 to 2–41.

The district court correctly overruled the motions for directed verdict and judgment notwithstanding the verdict.

**E.** *Sufficiency of the evidence: breach-of-contract claim.* As mentioned, the district court also overruled Nieman's motions for directed verdict and judgment notwithstanding the verdict regarding Olson's breach-of-contract claim. We need not consider issues Nieman raises as to these rulings because the jury apportioned all of the damages to the misappropriation-of-trade-secret claim.

Nieman's major contention here was that there was not sufficient evidence to support a finding that Nieman breached the confidentiality agreement by disclosing Olson's trade secret. In connection with our discussion of the misappropriation-of-trade-secret claim, we decided there was substantial evidence to support a jury finding that Nieman did disclose the trade secret.

Accordingly, we give the breach-of-contract issue no further consideration.

**IV.** *Issues on the Cross–Appeal.*

**A.** *Failure to award exemplary damages and attorney fees.* Olson complains because the district court refused to award exemplary damages and attorney fees even though the jury found Nieman's conduct willful and malicious. The basis of his complaint is that the district court gave no adequate reasons for its refusal.

■ We review for abuse of discretion a district court's refusal to award either exemplary damages or attorney fees pursuant to Iowa Code chapter 550. *205 Corp. v. Brandow,* 517 N.W.2d 548, 553 (Iowa 1994).

Iowa Code sections 550.4(2) and .6(3) provide that the district court "may award exemplary damages" and "may award actual and reasonable attorney fees" if a party willfully and maliciously misappropriated a trade secret.

■ **1.** *Exemplary damages.* The district court denied exemplary damages because it found Nieman had not unjustly enriched itself. The evidence shows that Nieman abandoned any effort to market the device after the November 1992 trade show and made little, if any, profit from sales of the device. Contrary to Olson's contention, we think this was sufficient reason to deny exemplary damages.

In addition, there was evidence that Nieman had been recently sold for about $1.2 million plus assumption of debts. We agree with Nieman that a judgment of almost half of the company's net worth is severe enough punishment, which is the object of exemplary damages. *See Ezzone v. Riccardi,* 525 N.W.2d 388, 398 (Iowa 1994) ("[P]unitive damages are awarded, not because the plaintiff deserves them, but as punishment, to deter the defendant and others from repeating similar outrageous conduct."); *see also Read Corp. v. Portec, Inc.,* 970 F.2d 816, 826–27 (Fed.Cir.1992) (holding that it is appropriate to consider defendant's size and financial condition on question whether to grant enhancement damages up to three times the compensatory award in patent infringement cases).

We find no abuse of discretion here.

■ **2.** *Attorney fees.* The district court gave the following reasons for denying attorney fees to Olson:

When litigation is involved and a claim for attorney fees is made, the Court will often seek to determine whether the litigation was frivolous, unduly prolonged and harassing in nature, or conversely was the result of sincere difference of opinion or interpretation of fact or law. As may be gleaned from previous sections of this opinion, this Court has found itself confronted with complex, novel and vexing issues of law and fact. This Court faults neither party for resorting to judicial resolution of their differences. Olson contends an award of attorney fees is necessary in order to "make Plaintiff whole". This Court is of the opinion that the jury verdict has amply served that purpose.

We think these reasons serve as an adequate basis for the district court's decision to deny Olson attorney fees.

■ **B.** *The supplemental special interrogatory.* Olson also complains because the district court submitted a supplemental special interrogatory. The interrogatory, in effect, asked the jury to apportion the $650,-000 damages award among the three theories of recovery submitted: breach of contract, misappropriation of a trade secret, and common-law tort of misappropriation of intellectual property. The jury assigned the $650,-000 award to the misappropriation-of-trade-secret claim.

■ We review jury instructions for correction of errors at law. *Grefe & Sidney v. Watters,* 525 N.W.2d 821, 824 (Iowa 1994).

If there was any error in submitting the interrogatory, it was harmless. By assigning the whole amount of the recovery to the misappropriation-of-trade-secret theory, the jury avoided a duplication of damages problem. *See Lara v. Thomas,* 512 N.W.2d 777, 783 (Iowa 1994). Olson was only entitled to $650,000 as the jury originally found, and that is exactly the judgment the district court ultimately awarded him.

**C.** *The common-law tort of misappropriation of intellectual property.* The district court sustained Nieman's motion for judgment notwithstanding the verdict regarding the common-law tort of misappropriation of intellectual property. The court thought this theory was not recognized as a viable cause of action in Iowa.

Olson wants us to recognize it. We need not decide the question because the jury did not apportion any of the damages to this theory. The issue is therefore moot.

## V. *Disposition.*

In summary, we conclude the district court did not abuse its discretion when it (1) refused to extend the expert disclosure deadline, (2) admitted expert testimony regarding patentability of Olson's idea, and (3) admitted expert testimony regarding damages. We also conclude there was substantial evidence to support the jury's finding that Nieman misappropriated Olson's trade secret. We conclude, therefore, the district court did not err when it denied Nieman's motions for directed verdict and judgment notwithstanding the verdict. We affirm on the appeal.

We also conclude the district court did not abuse its discretion when it refused to award Olson exemplary damages and attorney fees. If there was any error in submitting the supplemental special interrogatory regarding allocation of damages, it was harmless. We do not decide whether the common-law tort of misappropriation of intellectual property is a viable cause of action in Iowa. We affirm on the cross-appeal.

We have considered all of the parties' contentions whether or not we have discussed them. Those we have not discussed either lack merit or were not properly preserved.

**AFFIRMED ON THE APPEAL; AFFIRMED ON THE CROSS-APPEAL.**