G. W. SWAN, Appellant, v. W. J. DAVENPORT *et al*, Appellees.

Action for Accounting: PRINCIPAL AND AGENT: SALE OF PRINCIPALS' PROPERTY: PURCHASE BY AGENT: EVIDENCE. A trustee of an unincorporated company, who is also constituted an agent of a shareholder for the sale of his stock, may purchase the same if the sale is in good faith, and he cannot be compelled to account for the subsequent increase in value. Evidence considered and held to show a good faith sale to the agent.

*Appeal from Union District Court.*—HON. W. H. TEDFORD, Judge.

TUESDAY, JANUARY 20, 1903.

ACTION in equity for an accounting. The opinion states the facts. There was a decree dismissing the petition, and judgment against plaintiff for costs, and he appeals.—*Affirmed.*

*James G. Bull* and *Stuart & Stuart* for appellant.

*Maxwell & Winter* and *D. W. Higbee* for appellees.

BISHOP, C. J.—It appears that prior to October, 1896, one G. W. Bilbo had acquired an interest in a tract of mineral land in the state of Colorado, supposed to contain gold ore. Such interest consisted of a lease and bond granting the right to develop and operate the supposed gold mine during the term fixed, and to take and appropriate all gold and other minerals found therein. Not having funds to prosecute the work of development and operation, Bilbo conceived the plan of organizing a voluntary unincorporated association to take up and carry forward such work. Accordingly, and on October 1, 1896, a written instrument, called a "trust agreement," was drawn up, in which it is provided, in substance, that Bilbo shall hold title to the property as trustee for the benefit of himself and all others who shall join the association; that certificates of shares, limited to thirty in number, shall be issued to the members joining in the enterprise, each certificate to represent an undivided one-thirtieth interest in the property; that each shareholder shall pay the sum of $10 on the 1st day of each and every month until ruled otherwise by a majority vote of the certificate holders, which moneys shall be used in payment of development expenses, etc. The agreement further expressly authorizes the trustee to sell any share on which any monthly payment shall not have been made; such sale to take place on the 10th day of the month following the failure to pay, and for the highest and best price he can obtain on said

day. The certificate holders are authorized, in express terms to sell or assign their respective shares. The certificates issued also in terms authorize the sale thereof by the trustee in case of failure to make payments as provided in the agreement. The plaintiff and the defendants, other than the Creston Gold Mining Company, became shareholders in the enterprise. It further appears that during the time development work at the mine was in progress, the said Bilbo resigned as trustee, and the defendant Davenport was appointed in his stead, and went out to the mine and took active control of the work.

This controversy has reference solely to the subsequent ownership of the interest represented by the share certificate originally issued to the appellant Swan, and the question involved is largely one of fact. We shall content ourselves with a statement of the ultimate facts as we find them to be from our reading of the record. Swan made monthly payments on his share to the amount of $26.90. It seems that as time went on the prospect of making a fortune out of the mine did not brighten very rapidly. Partly because of this, and partly because it was inconvenient for him to provide the money, Swan lapsed in his payments. Being pressed for payment, he determined to sell his share. It is apparent that confidence in the venture did not run very high in and about Creston, this state, where these parties all lived; and accordingly Swan sent his share out to Davenport, in Colorado, requesting him to make a sale thereof, and stating in substance that he would be satisfied to get out of it the amount of money he had paid in. Davenport tried to find a purchaser and failed. Thereafter it seems that Davenport agreed to take the share himself, obligating himself merely to keep up the payments thereon, and this was acquiesced in by Swan. Davenport did make the subsequent payments, and it seems that Swan procured the delinquent payments to be charged to Davenport, saying that he had

bought the share. Davenport was on a salary, and from the next remittance to him the amount of such delinquent payments was deducted. Thus matters stood until Davenport came home to Creston on a visit. Matters at the mine were not looking very favorable, and at a meeting between himself and Swan he complained that he ought not to have been charged with the delinquent payment. At such meeting he offered the share back to Swan on condition that he should be reimbursed for the money he had invested. This offer Swan declined. A few days later a telegram came from Colorado stating that a rich vein of ore had been struck, and it is conceded that thereafter a large quantity of gold was realized.

In our view, there is no doubt but that Swan understood he had sold the share to Davenport, and the latter understood he had purchased the same, in consideration of his agreement to keep up the payments thereon. It is not conceivable that any controversy would have ever arisen but for the lucky strike at the mine. Counsel urge that it was within the understanding of Swan that a sale, to be binding upon him, should have been made in the manner prescribed by the trust agreement. It must be borne in mind that we are not dealing with any right or interest of the other parties to the agreement. As between Swan and Davenport, they had the right to deal with the share as they pleased. That parties, competent to do so may freely make transfers of property rights is a well-established doctrine of law in this state, and a court of equity will protect and enforce the same. It is also said that Davenport being the trustee of all the parties in interest, including Swan, and having been constituted a special agent by Swan for the sale of the share in question, he ought now to be required to account. The answer to this contention is obvious. The agency ceased when the purchase of the share was made. An agent may pur-

chase property in his hands belonging to his principal, and the sale will be good if the transaction be dominated by good faith and fairness.    This is elementary.    The r-cord does not disclose any want of good faith or fairness. The situation was clearly understood by Swan, and at the time he acted advisedly.

We see no cause for disturbing the decree, and it is AFFIRMED.