FOREST FOWLER et al., appellees, v. BERRY SEED COMPANY, a corporation, appellant.

No. 49153.

(Reported in 84 N.W.2d 412)

August 1, 1957.

J. D. Reynolds, of Creston, and R. E. Killmar, of Osceola, for appellant.

Thos. E. Mullin, of Creston, for appellees.

Smith, J.—Division I of the petition states the claim of plaintiff Forest Fowler, Division II of plaintiff W. E. Fowler, and Division III of plaintiff Louis Alford. Division I alleges plaintiff Forest Fowler "in conjunction with other parties and the defendant," operated bluegrass yards at Creston, Emmetsburg and Spencer, Iowa, and Hyannis, Nebraska; that he, Forest, and plaintiff W. E. Fowler (his brother) operated at Creston; he and Jack Hutchinson operated at Emmetsburg, Iowa, and

Hyannis, Nebraska; and that he and plaintiff Louis Alford operated at Spencer. Jack Hutchinson is not a party.

Defendant, Berry Seed Company (whose main office is in Clarinda, Iowa), was represented by, or operated under the name of, "Creston Seed Company" in all the transactions. Defendant's president, Charles E. Sinn, says the Creston concern is "an operating branch" and its "principal product is bluegrass." The petition refers to it as defendant's "office and agency." It is not shown to be a corporation. Defendant, in its brief, refers to defendant operating under the "trade name" Creston Seed Company. There is no issue however over its power to bind defendant-company here. Defendant also calls it "a bluegrass seed threshing and processing plant."

Three so-called contracts (dated June 15, 1952, but apparently executed and notarized July 9, 1952) were signed "Creston Seed Company, Robert Hutchings, Mgr." Copies B, C and D are attached to the petition and appear in evidence as Exhibits 2, 3 and 4 respectively. They are unilateral and are practically identical except as they purport to be with different nonsigning parties. They are on Creston Seed Company printed letterhead, "Buyers and Sellers of Field and Grass Seeds."

Exhibit B purports to be with "Fowler Bros." and is as follows, omitting printed letterhead:

"June 15th, 1952

"This is the contract between Fowler Bros. and the Creston Seed Co.

"The Creston Seed Company agrees to furnish strippers to Fowler Bros. for transportation to and from the home plant of the Creston Seed Co. These charges are to be charged to the operation, just like other fixed expenses, transportation charges.

"Fowler Bros. are to get 7¢ per mile for the use of their car during the stripping season, and all their expenses are to be charged to the operation, as an expense.

"When the seed is delivered to the Creston Seed Company, Fowler Bros. has the choice of selling it on a dried basis, at a fixed sum per bushel, and all expenses are to be deducted from the money received for the seed. Then Fowler Bros. gets half the profit for their share of the operation.

"If the Company and Fowler Bros. cannot agree on the dried seed price then the seed will be threshed and sold on a prorate basis, and settlement will be made on the basis of the average selling price of all the seed sold during the year, starting June 30th, and ending June 25th of the following year, 1953, and a charge of 30¢ per rough bushel will be assessed against the operation for threshing.

"Signed
Creston Seed Company
Robert Hutchings Mgr.

"Signed
Grace E. Kelley Bkpr.
July 9/52 (Notarial Seal)."

Exhibit C purports to be the contract with Forest Fowler and Jack Hutchinson "of the Hyannis, Neb. yard", and Exhibit D similarly names Forest Fowler and Louis Alford as the nonsigning parties. Clearly these are not complete written contracts but appear more in the nature of memoranda, by the signing party, of its claimed oral contract or understanding with the nonsigning party. While the written language is not so limited, plaintiffs' claims all relate to operations during the bluegrass season of 1952. Testimony as to transactions in earlier years concerns items in the counterclaim and has some relevance also in appraising the conduct of the parties in the 1952 season.

Defendant's counterclaim is in twelve divisions, covering nearly eighteen pages of printed record. Some divisions pray for definite money judgment; some only for setoffs to be considered "in connection with the accounting involved"; some are directed against plaintiff Forest Fowler alone; some include one of the other plaintiffs in the prayer; some are for items involved in the seasonal bluegrass operations, others apparently not.

The involved nature of the operations of course required somewhat voluminous pleadings; but the pattern for appellate purposes becomes more simple as it is studied. Plaintiff Forest Fowler's connection with each of the four yards and each of the other plaintiffs and the further fact he is the only plaintiff who testifies, and seems to have negotiated all the arrangements, largely explain the real unity of the several cases. He is the connecting link—the moving spirit among plaintiffs.

The trial court entered judgment against defendant for each

plaintiff in the amount asked, except the prayer of Forest Fowler is reduced from $2399.37 to $972.37. One fourth of costs ($62.89) was also taxed against him and three fourths ($188.60) against defendant.

All parties appeal, but manifestly two of the plaintiffs are unprejudiced by the trial court's judgments and have no standing here except as appellees. Forest is the only real cross-appellant, though all three plaintiffs are named.

The record justifies a preliminary observation that much of the controversy grows out of defendant's belated disapproval of the intimate business relations between Forest Fowler and Creston Seed Company, defendant's "operating branch" and its manager, Robert Hutchings, who prepared and signed the "contracts" Exhibits B, C and D. Plaintiffs Forest Fowler and W. E. Fowler are brothers and plaintiff Alford is son-in-law of Robert Hutchings. There is suggestion (but no evidence) of nepotism. It may be agreed the setup was unwise from a strictly business standpoint.

Hutchings was plaintiffs' principal witness other than Forest Fowler. He says he started work for defendant in 1918; was thereafter (1923) transferred "to the Chicago branch in charge of seed cleaning and shipping operations", became "a qualified seed analyst" in 1934 and eventually (1945) manager of the Creston "branch": "I was to hire, fire, buy and sell and have complete jurisdiction of everything." Leslie E. Finley, who represented defendant in employing Hutchings, corroborates Hutchings' version: "He was told he was the manager of the plant and that was it." Finley was assistant manager of defendant as well as treasurer and member of the board. He testifies Mr. Sinn, president of defendant, verified the appointment of Hutchings the next morning.

According to Forest Fowler's testimony Hutchings employed him as foreman (he also says "assistant manager") of the Creston plant in 1946 or 1947: "We would have between 25 and 30 men on the payroll." They had the first joint bluegrass "operation" in 1949. He says: "The company was to furnish the bags, money, machinery and strippers and I was to do the work and split the profits in Creston and at Spencer in 1949." They had

the same deal in 1950: "I got one third, the Berry Seed Company got one third and Lou Alford got one third of the profit at Spencer."

Forest also identified Exhibit 1 (Exhibit A, attached to petition), which was executed contemporaneously with the execution of Exhibits A, B, and C, and was on a Creston Seed Company printed invoice, as follows:

"Invoice to CRESTON SEED COMPANY, Creston, Iowa
Name Forest Fowler Address: Creston State, Iowa
Fowler Bros. Date: July 9, 1952.
Other Shipper
Fowler & Alford

PURCHASE.

All rough seed belonging to above at following prices
per bu. $3.25 For Nebr. Seed
per bu. $3.00 For all Iowa seed including Spencer
SPENCER SEED F.O.B. Spencer
His share of profits shown on contracts
Robert Hutchings

(Notarial Seal)
Grace E. Kelley."

We omit a printed "Declaration of Origin and Variety" at bottom of form for the "Grower" to sign which was of course unused. Also, vertical column lines running through the written part with printed headings: "Lot Number", "Kind of Seed", "Marks", "Gross Weight", "Bags", "Dock", "Net Seed in Pounds", "No. of Bushels", "Price", and "Amount."

A long cross-examination of Fowler appears in the record as to numerous persons of whom the witness bought seed while operating under Exhibit 1 during 1952. He denies he ever divided profits with Hutchings or that to his knowledge Hutchings ever refused to buy from any party offering seed to Creston Seed Company, and instead sent the would-be seller to him, Fowler. The cross-examination developed that the witness and Hutchings had, after separation from defendant (in 1953), entered into "a partnership arrangement" in the bluegrass business at Spaulding, Iowa, in a building belonging to the witness which he had formerly rented to Creston Seed Company.

Mr. Hutchings' testimony relates largely to technical details of the bluegrass business and difficulties encountered in management of the Creston plant and its business in various places. Were we capable of doing it, any adequate condensation would be of doubtful value here. Sufficient to say it corroborates the testimony of Fowler generally.

He says: "While I was manager * * * the ones (partnerships) I had anything to do with, there was no stripper rental, no bag rent, and no interest. There was no charge made for any power broom on our yard. * * * Q. Take the bluegrass year of 1952, about how many times did you discuss the operations with Mr. Sinn or officers of the Company there prior to the time any contracts were drawn up? A. I would say more than all the rest of the years put together. * * *."

He testifies the contracts Exhibits 2, 3 and 4 (same as Exhibits B, C and D) were discussed "heatedly and very frequently", and "they (the parties) agreed that for the following year there would be no interest and stripping charges or bag rental." "When these were signed it had been determined there would be none of these charges."

While Forest Fowler's connections with the other plaintiffs and Hutchinson may have been partnerships, the seasonal business arrangements with the Creston Seed Company were more in the nature of joint adventures. The distinction is immaterial here however. The two relationships are not materially different so far as concerns our problem.

Both Fowler and Hutchings were employees and, to a certain extent, Fowler was an agent, of defendant-company by reason of their regular connection with the Creston "branch"; and plaintiffs were seasonal partners or coadventurers by reason of the seasonal arrangements for handling the bluegrass business. But these interlinking connections were known and understood by defendant and were a part of its system of getting and handling seasonal business.

I. The testimony of Mr. Sinn, president and general manager of defendant-company, contradicts that of plaintiff Forest Fowler as to the conclusion of their conference in Clarinda concerning the arrangements for the 1952 season. Sinn was at that time trying to put the 1952 arrangement on a written

contract basis and wanted to include charges not previously covered. He submitted a form which Fowler refused to sign because it contained new charges he was unwilling to agree to.

That Clarinda conference (in Spring of 1952, though once erroneously referred to as 1953) came about upon Hutchings' suggestion. Fowler testifies that he told Mr. Sinn he would "rather have a contract, but me and Bob (Hutchings) would fix up a contract of our own * * *. He (Sinn) said when we finally finished up 'Go ahead the way you have been going.'"

Sinn says: "I agreed with Fowler * * * to waive the selling charge if he would sign up the contracts and go ahead. When he went out he said it would be satisfactory." The record shows the 1952 season's operations were substantially in accordance with Exhibits B, C and D and not fundamentally different from operations in previous years. It seems unavoidable that defendant knew, or should be charged with knowledge of, what had been the custom in previous years. There is no conflict in testimony as to what that custom was. It is significant here as it makes plaintiffs' version of what occurred in 1952 more probable.

It is unnecessary to review the testimony of other witnesses who were not present when the 1952 arrangements were discussed. Generally speaking Forest Fowler, Hutchings and Sinn were the principal figures and the testimony of the first two conflicts with that of the third. We find the preponderance of evidence is in favor of plaintiffs. Sinn was confronted with loss of the business for the 1952 season from the four yards dominated by plaintiff Forest Fowler, and apparently the time for negotiation had grown short. It seems probable he yielded rather than face possible loss of the 1952 business which was threatened if he broke with Fowler and Hutchings.

II. We have no disagreement with the general principles enunciated by defendant's brief concerning the duties of employees toward their employers and agents toward their principals. But the nature (or scope) of the employment or agency must be considered.

Whether the agency exists and its extent are questions of fact. Grismore v. Consolidated Products Co., 232 Iowa 328, 334, 5 N.W.2d 646, and cases cited. The general rule that a fiducial relation exists between agent and principal *within the scope of*

*the agency* and the requirements of good faith and loyalty in their dealings are unquestioned. But an agent concerning one matter will not be incapacitated from dealing with his principal in another. 3 C. J. S., Agency, section 145a, page 26, note 64, citing, among other authorities, Collar v. Ford, 45 Iowa 331. See also Swan v. Davenport, 119 Iowa 46, 93 Iowa 65.

"An agent is not, as such, in a fiduciary relationship with the principal as to matters in which he is not employed." "Nor is a person ordinarily subject to a fiduciary duty in making terms as to compensation with a prospective principal." 2 Am. Jur., Agency, section 252, page 203, note 12, citing American Law Institute Restatement, Agency, section 390.

"It is obviously true that these duties may be modified by a contract between the parties." 2 Am. Jur., Agency, section 251, citing Restatement, Agency, section 376, where it is stated: "'The existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties, *interpreted in light of the circumstances under which it is made,* except to the extent that fraud, duress [or] illegality * * * deprives the agreement of legal effect." (Emphasis supplied.)

Undoubtedly Hutchings disagreed with the president as to changing the general plan of operation that had been followed for several seasons. And he was willing to resign rather than yield his point. That was his right and there was no secrecy in his stand. There is no element of fraud in his attitude, certainly none chargeable to plaintiffs.

Nor do we find Fowler guilty of any breach of faith or duty as an employee of defendant or of Creston Seed Company. His regular employment was quite separate and distinct from the seasonal contractual relationship as coadventurer concerning which he and Mr. Sinn were negotiating. They were dealing at "arm's length" (not as employer and employee) and concerning a seasonal relationship analogous to their custom in previous years. The defendant must be charged with knowledge of their prior seasonal adventures and the nature of the negotiations in which they were presently engaged.

III. Neither defendant nor plaintiff Forest Fowler is satisfied with the trial court's disposition of the counterclaim. Both

appeal. Defendant complains mostly (Divisions I to VIII inclusive of its brief) of items which "inhere in the (alleged) error" related to the controversy over seasonal contracts already disposed of in previous divisions hereof. We need not go over that ground again.

Plaintiff Fowler's complaint concerns items of the counterclaim allowed against him not associated especially with the matters involved in their seasonal relationship—alleged conversion of several items amounting to $515, and one for $912 for the labor of Bill Herron (defendant's employee) on Fowler's farm.

These items are related to plaintiff Fowler's regular employment rather than to the seasonal joint adventure contracts. That is certainly true of the $912 item. Hutchings testifies he authorized Fowler to use Herron on his (Fowler's) farm to make it possible for the Creston concern to dump threshing chaff out there after the city refused to allow use of the city dump: "He (Fowler) said we could put it on his farm if we put a man down there to spread it out. If it infected his farm with weeds, we would spray it and give him $50 a month for the privilege. That was why Bill Herron was at the farm."

We find no reference to this circumstance in Fowler's testimony nor does Herron testify. Fowler, as cross-appellant, argues "defendant completely failed to prove that Bill Herron was used on Fowler's farm for Fowler's personal use." But that was not defendant's burden.

Mr. Wirth, who came up to Creston as bookkeeper of the Creston Company on June 23, 1952, testifies: "I know that every night during the week he (Herron) would go down to this farm with Forest Fowler and help do the chores and help take care of the cattle. I heard Mr. Fowler call him several times over to the building and tell him to go down to the farm and do the chores. * * * He was paid on company time."

This evidence, combined with Fowler's regular relationship as foreman and employee of the company, certainly merited more explanation than that given by Hutchings. The unexplained failure to call Herron as a witness also has significance. We are content to abide by the trial court's judgment as to these various items of counterclaim as against appeals from both sides.

The involved relationship of the parties and the multiplicity of factual details encourage us to lean heavily on the legal presumptions attending transactions between principal and agent or employer and employee, in dealing with matters within the scope of the agency or employment.

There is on file a motion by defendant to dismiss the cross-appeal. In view of our conclusion on the merits it is overruled.

The case is affirmed on both appeals.—Affirmed.

OLIVER, GARFIELD, WENNERSTRUM, THOMPSON, LARSON, and PETERSON, JJ., concur.