# IN THE SUPREME COURT OF IOWA

No. 12–1817

Filed December 27, 2013

**ST. MALACHY ROMAN CATHOLIC CONGREGATION OF GENESEO, ILLINOIS; STEVE BRISTOL; CONNI BRISTOL;** and **KEWANEE AREA UNITED WAY,**

Appellants,

vs.

**DONNA K. INGRAM,** as Executor of the ESTATE OF JAMES INGRAM, and **ROBERT W. BAIRD & CO., INC.,**

Appellees,

and

**MARIE R. TARBOX** and **GOSMA, TARBOX & ASSOCIATES, P.L.C.,**

Appellants.

_____

Appeal from the Iowa District Court for Scott County, Thomas G. Reidel, Judge.

Alleged beneficiaries of a decedent's estate plan appeal from a district court order granting summary judgment to the estate of the decedent's financial advisor and the firm employing that advisor. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Peter C. Riley of Tom Riley Law Firm, P.L.C., Cedar Rapids, for appellants St. Malachy Roman Catholic Congregation of Geneseo, Illinois; Steve Bristol; Conni Bristol; and Kewanee Area United Way.

Kevin J. Visser and Lisa A. Stephenson of Simmons Perrine Moyer Bergman PLC, Cedar Rapids, for appellants Marie R. Tarbox and Gosma, Tarbox & Associates, P.L.C.

William T. McCartan of Bradley & Riley PC, Cedar Rapids, for appellee Robert W. Baird & Co., Inc.

Gregory M. Lederer and Megan R. Dimitt of Lederer Weston Craig PLC, Cedar Rapids, for appellee Donna K. Ingram, executor of the estate of James Ingram.

**MANSFIELD, Justice**.

### I. Introduction.

This case requires us to decide whether a financial advisor to an individual can be sued by identified beneficiaries of the individual's signed written estate plan when, due to the advisor's allegedly negligent performance of his duties, those beneficiaries do not receive what they were supposed to get under the plan. We conclude the rationale of *Schreiner v. Scoville*, 410 N.W.2d 679, 682 (Iowa 1987), which held that attorneys could be sued in these circumstances, extends to nonattorneys acting within the scope of their agency. Accordingly, we reverse the summary judgment below in part and remand for further proceedings.

Specifically, we find that plaintiff Steve Bristol was owed a duty by the decedent's financial advisor and has raised a genuine issue of material fact as to whether the financial advisor's negligent performance of his agency responsibilities caused Bristol not to receive a specific devise set forth in the decedent's will. Accordingly, we reverse the judgment that was entered against Bristol and his spouse. However, as to plaintiffs St. Malachy Roman Catholic Congregation of Geneseo, Illinois, and Kewanee Area United Way, we find their damages are too speculative and affirm the judgments against them on this alternative ground.

### II. Facts and Procedural Background.

This controversy centers on the estate planning of Alvin Engels, who died in February 2006 at the age of eighty. Engels was never married and had no children.

Beginning as early as 1993, Engels retained James "Jay" Ingram of Piper Jaffray as a securities registered representative. At some point, Engels apparently began speaking with Ingram about estate planning.

On September 24, 1999, Engels executed a revocable trust agreement that appointed Engels and Loretta Wongstrom the cotrustees of the Alvin F. Engels Revocable Trust. Engels also created the Engels Charitable Foundation, a not-for-profit corporation, of which Engels, Ingram, and Wongstrom were appointed directors.[1] The Revocable Trust and Charitable Foundation paperwork was drafted by attorney Jerry Pepping, while Ingram handled the transfer of Engels's assets—including his home, checking accounts, Piper account, series H and HH bonds, a promissory note, and a variable annuity—to the Revocable Trust.

The Revocable Trust agreement provided that, upon Engels's death, the Revocable Trust assets would be disbursed to two new trusts: Trust A and Trust B. Trust A would be funded only to the extent necessary to minimize federal estate taxes. The contents of Trust A were to be distributed to the Charitable Foundation, except for $15,000, which would go to St. Malachy Roman Catholic Congregation (St. Malachy's). Trust B would receive the remaining assets, which would be used for the benefit of Katherine, Andrea, and Andrew Bristol and Jerri McLane, Lynn McLane, and James Kleinau.[2]

It is clear that Ingram was involved, to some degree, in the planning for Engels's estate during this time, including the Revocable Trust. Pepping sent drafts of the Revocable Trust agreement and a draft of Engels's last will and testament to Engels, Ingram, and Wongstrom. Ingram was also named as executor of Engels's will in an October 1, 2001 codicil and, on the same day, was named as the successor trustee

---

[1]We will refer to the Alvin F. Engels Revocable Trust and the Engels Charitable Foundation as "the Revocable Trust" and "the Charitable Foundation," respectively.

[2]The Bristol family were neighbors of Engels. Jerri McLane, Lynn McLane, and James Kleinau were nieces and a nephew of Engels.

of the Revocable Trust. Less than a year later, Ingram was appointed Engels's attorney-in-fact for healthcare decisions.

In approximately November 1999, Ingram left Piper Jaffray for Robert W. Baird & Co. He took the Engels account with him.

In 2003, Engels apparently decided to alter his estate plan. On October 1, 2003, Engels executed five documents: (1) a durable power of attorney appointing Jerri McLane as attorney-in-fact for healthcare decisions, (2) a living will, (3) a durable financial power of attorney appointing Ingram attorney-in-fact for Engels's financial affairs, (4) a new last will and testament, and (5) a charitable trust agreement creating the Alvin F. Engels Charitable Trust.[3]

These documents were drafted by attorney Marie Tarbox of the law firm Gosma, Tarbox & Associates. Ingram signed the Charitable Trust agreement, Ingram's wife witnessed three of the documents, and each document, with the exception of the living will, was also notarized by Ingram's assistant, Mardee Trapkus.

The Will provided that Steve Bristol would receive Engels's residence located in Geneseo, Illinois.[4] In addition, the Will made specific bequests of $75,000 to Jerri McLane, $25,000 to Lynn McLane, and $25,000 to James Kleinau. However, the entire residue of the estate after these bequests was to be paid to the Charitable Trust. The Will named Jerri McLane as executor and Ingram as successor executor in the event McLane could not serve.

---

[3]We will refer to the 2003 last will and testament and the 2003 Alvin F. Engels Charitable Trust as "the Will" and "the Charitable Trust," respectively.

[4]As noted, Steve Bristol was Engels's neighbor in Geneseo.

The Charitable Trust provided in article 3 as follows:

> On the death of the Grantor [Engels], the Trustee shall distribute the net income and so much of the Trust principal as the Trustee may determine among St. Malachy's Catholic Church, Geneseo, Illinois, and the United Way and the American Red Cross, with direction that distributions to the latter two organization[s] shall be used for the benefit of residents of Henry County, Illinois, and to such other 501(c)(3) organizations benefitting Henry County, Illinois as may apply for distributions and which the Trustee, in its sole discretion, determines appropriate in any given year.
>
> The Grantor recognizes that he is placing a good deal of discretionary power in the Trustee, and is confident that the Trustee will exercise its discretionary power in a manner that will best meet[] the needs of the charitable organizations named herein, Geneseo, Illinois and Henry County, Illinois over the years.

In article 5, Ingram and Jerri McLane were designated to serve as cotrustees of the Charitable Trust upon Engels's death. The Charitable Trust also provided:

> If either of the named Trustees is unable or unwilling to serve as a Trustee, the Trust assets shall be distributed to the Geneseo Is For Tomorrow ("GIFT") Community Foundation with the remaining Trustee to serve in assisting the GIFT Board of Directors in determining distributions from the Trust in a manner consistent with those set forth in Article 3, hereof.

As with the 1999 estate planning documents, the record reflects that Ingram was heavily involved in the development of the 2003 Will and Charitable Trust. Tarbox testified she had a referral relationship with Ingram and received four to six referrals from him annually between 1998 and 2002. In each referral, Tarbox testified Ingram typically provided her with

> background information about the client in the sense of what their asset value was, if there was a trust in existence, information about the family, information about things that may be of particular concern to that client, and if there had

been [specific] things that he had discussed with the client. . . .

Engels was one of these referrals. Tarbox said she had three or four conversations with Ingram in which he outlined Engels's estate plan before she ever met with Engels.

According to Tarbox, during her meeting with Engels, Mardee Trapkus—Ingram's assistant—was also present. Tarbox stated Ingram had told her in advance which charities Engels wanted to benefit. Despite Ingram's history of disclosing a client's existing trusts, Ingram made no mention of the existence of Engels's Revocable Trust. Tarbox indicated she did not become aware of the existence of the Revocable Trust or the Charitable Foundation until after Engels's death. She admitted she never asked Engels how his assets were titled.

Following the discussions with Ingram and her meeting with Engels, Tarbox concluded Engels's intent was to leave his home to neighbor Steve Bristol, $25,000 each to niece Lynn McLane and nephew James Kleinau, $75,000 to niece Jerri McLane, and the remainder of his assets to charity through the Charitable Trust. That meeting was the only time Tarbox ever spoke directly with Engels. She summarized her conclusions in a September 25, 2003 letter to Engels, copied to Ingram, which read in part as follows:

> Briefly, you indicated that you wanted Steve Bristol to receive your residence and that your niece Jerri McLane should receive $75,000. Your niece and nephew Lynn McLane and James Kleinau are to receive $25,000 each. After those distributions, the balance of your assets are to be held and distributed to charities and Jay [Ingram] and Jerri [McLane] may decide.

With the letter, she enclosed draft documents, including versions of the Will and Charitable Trust agreement. She later testified it was her

intention that Engels would review the documents and return to her office to execute them if they were acceptable.

According to Tarbox, rather than returning to Tarbox's office, Engels executed the documents and merely had copies delivered to Tarbox. Tarbox was angry that Engels had executed the documents outside of her office. Apparently, Tarbox and Engels patched things up because Tarbox continued to do work for Engels.[5]

Meanwhile, the record indicates that Ingram made several efforts to get Engels to transfer his assets into his Charitable Trust during his lifetime. On January 23, 2004, Ingram's assistant Trapkus sent Engels a letter that stated,

> I have enclosed a form that needs to be signed so that Marie Tarbox can change the ownership of your house into the [Charitable] Trust that you have created.
>
> Please sign by the red arrow and return to me in the envelope I have enclosed. I will notarize your signature for you.

Nineteen days later, on February 11, 2004, Tarbox's office sent a quitclaim deed to the recorder's office. The quitclaim deed stated "Alvin F. Engels" was conveying the home in Geneseo to the "Alvin F. Engels Charitable Trust Agreement." The deed was recorded on February 23, 2004. However, apparently unbeknownst to Tarbox, at the time the home was titled in the name of the Revocable Trust, not in Engels's name, so the deed was ineffective.

Approximately one year later, in February 2005, Ingram sent another letter to Engels regarding the Charitable Trust. In it he stated:

---

[5]Tarbox's client ledger shows she billed Engels $850 for the estate planning services from September 19–25, 2003. Her records indicate that on November 21, 2003, Engels paid her $425 for those services.

> Mardee [Trapkus] indicated that you have some issues with Marie [Tarbox]. It's important to make choices according to what you want. (It's your money and you can control where it goes.) I've enclosed transfer forms that are necessary to move your assets into the [C]haritable [T]rust.
>
> Enclosed are forms necessary to transfer your assets into the [C]haritable [T]rust.

Tarbox testified she was unaware of Ingram's attempts to transfer Engels's property into the Charitable Trust. Had she been asked about the transfers, she claims she would have told Ingram or Engels the transfers were "inappropriate" because Engels would lose the benefit of those assets during his life. Yet, it is not disputed that Tarbox's office sent the quitclaim deed for Engels's home to the recorder's office in February 2004. The successful transfer of the home to the Charitable Trust would have resulted in the need for Engels either to sell the home or to make rent payments in order to continue living there. While Tarbox did not deny preparing the quitclaim deed and admits she would have known of its existence because she signed the check to the recorder's office, she stated she had no recollection of preparing it and was uncertain if the request for the deed would have come from Ingram or Engels. She indicated she would have told Ingram or Engels about the implications of transferring the home when asked to prepare the deed.[6]

Several months later, in August 2005, Ingram again wrote Engels urging him to fund the Charitable Trust by transferring his brokerage account assets into it. Ingram noted the annual income on Engels's account amounted to $20,000 and "[t]he annual gifting of $20,000+ to worthwhile charities, organizations and scholarships will make a

---

[6]Tarbox also did not explain why she would have arranged for the transfer of the home to the Charitable Trust when Bristol was to receive the home under the 2003 estate plan.

substantial impact on the lives of many people in the future." Ingram added, "We really need to get the [C]haritable [T]rust funded, so please return the enclosed forms to your attorney when you make your changes."

On January 6, 2006, Ingram's office called Tarbox to let her know that Engels wanted to change the designated individual on his healthcare power of attorney. Tarbox drafted the necessary forms and sent them to the new designee.

At this time, Engels's health was deteriorating. Ingram sent a letter to Central Trust and Savings Bank indicating Tarbox had "requested that [Ingram] assist [Engels] in compliance with his Durable Financial Power of Attorney dated October 1, 2003." He asked the bank to "honor [Ingram's] signature on [Engels]'s personal checks until further notice." Engels died on February 12, 2006.

On February 15, 2006, Tarbox sent a letter to Ingram offering "a short review of Mr. Engels'[s] estate plan documents." In it, she went over the terms of the Will and the Charitable Trust. Tarbox testified she first became aware of the Revocable Trust after Engels's estate was opened and Ingram provided the Revocable Trust documents to her.

In a handwritten, one-page document that Ingram created after Engels's death entitled "Alvin Engels Estate," Ingram listed the monetary bequests to the nieces and nephew under the Will and additionally noted the house was to "deed out quickly to Bristol."

However, Engels's assets were still titled in the Revocable Trust. As a result, the provisions of the Revocable Trust controlled the distribution of his assets, and there were no assets to be probated under the Will. This meant there was no residuary to fund the Charitable Trust.

It is not clear when Ingram became aware that Engels's assets would pass according to the Revocable Trust rather than the Will. Regardless, he clearly knew this by August 15, 2006, when he sent the following letter to the priest of St. Malachy's:

Hi Father—

Please accept this as a donation to help cover the cost of the funeral luncheon for [Engels].

[Engels]'s intentions were to remember St. Malachy's in a significant manner, but his last will was declared invalid and his entire estate will be given to his relatives.

It's unfortunate.

Approximately a year later, in August 2007, the counsel for St. Malachy's sent a letter to Ingram asking him to

investigate and initiate an attorney's malpractice suit [against] Marie Tarbox and Gosma, Tarbox & Associates, P.L.C. for negligence in preparing the Last Will & Testament of Mr. Engels and for not revoking his revocable living trust and re-titling his assets to carry out his last wishes.

St. Malachy's asserted Ingram, as a trustee of the Charitable Trust, had a fiduciary duty to the beneficiaries of the Charitable Trust— St. Malachy's, the United Way, and the American Red Cross.

Ingram did not bring a claim against Tarbox or her law firm, but instead responded through counsel on September 5, 2007. The letter stated:

Ingram followed his fiduciary duties by prudently investing the assets of the 1999 Revocable Trust as well as by making distributions of Trust proceeds in accordance with the terms of the governing trust documents. As such, we believe that any malpractice action should be brought by the beneficiaries.

On January 27, 2011, St. Malachy's, Steve Bristol, and his wife Conni Bristol filed a petition naming Tarbox, Tarbox's law firm, Ingram,

Ingram's employer Baird, the American National Red Cross, the American Red Cross of the Quad Cities Area, and the Kewanee Area United Way as defendants. The plaintiffs alleged negligence by Tarbox and Ingram and their respective firms. On March 7, 2011, shortly after the petition was filed, Ingram died. His wife, Donna Ingram, as executor of Ingram's estate, was substituted as a defendant on April 5, 2011.[7]

The Red Cross entities have never appeared in the litigation. United Way answered and filed cross-claims against Tarbox and her firm, and against Ingram and his firm, and therefore was realigned as a plaintiff.

Ingram and Baird initially moved to have the claims against them dismissed for failure to state a claim. They maintained they owed no duties to the beneficiaries of the Charitable Trust or the Will and that the plaintiffs' claims were barred by the economic loss doctrine. The district court denied the motion.

Baird then moved for summary judgment on July 20, 2012. Baird argued no duty to the plaintiffs existed, any duty owed was discharged by Ingram's act of supplying the necessary documents to transfer Engels's assets to the Charitable Trust, the claims were barred by the economic loss doctrine, St. Malachy's and the United Way lacked standing to bring claims, and the damages allegedly sustained were too speculative. Ingram joined Baird's motion for summary judgment.

St. Malachy's and the Bristols resisted the motion. They maintained that Ingram's "intimate role as a financial advisor for Alvin Engels," Ingram's close relationship with Tarbox in connection with

---

[7]We will use "Ingram" hereafter to refer interchangeably to Jay Ingram and his estate.

Engels's estate planning, and Ingram's knowledge of Engels's desire to benefit the plaintiffs created a duty to the specifically identifiable beneficiaries of the Will and Charitable Trust. They also argued that if the court found St. Malachy's and the Bristols lacked standing, the Charitable Trust should be substituted as a party.

Tarbox and her law firm also filed a brief resisting the plaintiffs' suggestion that the Charitable Trust should be substituted or joined as a party in the case.

The district court issued its ruling on the motion for summary judgment on September 10, 2012. In it, the court addressed only Baird and Ingram's arguments related to duty. The court determined neither Ingram nor Baird owed any duty to the beneficiaries of the Will or the Charitable Trust to advise Tarbox or Engels that Engels's assets were held in a Revocable Trust and needed to be moved out of that trust. The court explained, "The Court agrees with Baird's assertion that judicial creation of a duty to beneficiaries of a client's estate or trust would lead to divided loyalties of securities registered representatives." It added, "The Court simply cannot and should not create a duty for a securities registered representative that would, in any manner, require or encourage that individual to practice law without a license."

Because the court found no duty existed, it concluded it was "unnecessary for the Court to address the remaining contentions set forth in the brief" submitted by Baird and joined by Ingram. The court granted the motion for summary judgment and dismissed the claims against Ingram and Baird.

St. Malachy's, the Bristols, and United Way, joined by Tarbox, submitted an application for interlocutory appeal. We treated Tarbox's

joinder as a separate application for interlocutory appeal and granted both applications.

### III. Standard of Review.

Summary judgment is appropriate if

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Iowa R. Civ. P. 1.981(3). The district court's ruling on a motion for summary judgment is reviewed for correction of errors of law. *Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 96 (Iowa 2012).

### IV. Analysis.

**A. Duty.** The plaintiffs allege Ingram and Baird acted negligently in the course of their dealings with Engels and that this negligence harmed them. "Generally, [a]n actionable claim of negligence requires the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages." *Id.* at 98 (internal quotation marks omitted).

"The issue of whether a particular duty arises out of parties' relationships is always a matter of law for the court to decide." *Dettmann v. Kruckenberg*, 613 N.W.2d 238, 251 (Iowa 2000) (internal quotation marks omitted). Historically, we have considered three factors when determining whether a duty exists: "(1) the relationship between the parties, (2) reasonable foreseeability of harm to the person who is injured, and (3) public policy considerations." *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009) (internal quotation marks omitted). In *Thompson*, we held foreseeability can no longer form the sole basis for a court's no-duty determination. *Id.* at 835; *see also Pitts*, 818 N.W.2d at

98 ("In *Thompson*, we . . . , in general, rejected the use of foreseeability when determining, as a matter of law, that one party did not owe a duty to another."). However, we later noted the *Thompson* duty analysis is not dispositive in cases like the present one that are "based on agency principles and involve[] economic loss." *See Langwith v. Am. Nat'l Gen. Ins. Co.*, 793 N.W.2d 215, 221 n.3 (Iowa 2010), *superseded by statute*, 2011 Iowa Acts ch. 70, § 45 (codified at Iowa Code § 522B.11(7) (Supp. 2011)); *see also Pitts*, 818 N.W.2d at 99 ("Since this is a case based on agency principles and involving economic harm, we will not rely on the concept of duty embodied in *Thompson* . . . .").

As a registered representative, Ingram was clearly Engels's agent in certain respects. *See* Restatement (Third) of Agency Intro., at 9 (2006) (noting that "[s]ecurities brokers . . . are the subject of statutory and administrative regulation, but the common law of agency otherwise governs relationships between and among the agent, the principal, and third parties to transactions"). "As a general matter, a stockbroker is an agent of his client." *Thompson ex rel. Thorpe Family Charitable Remainder Unitrust v. Federico*, 324 F. Supp. 2d 1152, 1166 (D. Or. 2004); *see also O'Malley v. Boris*, 742 A.2d 845, 849 (Del. 1999) (stating that "[t]he broker, as agent, has a duty to carry out the customer's instructions promptly and accurately"); *Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 492–93 (Tex. App. 1994) ("The relationship between a broker and its customer is that of principal and agent.").

To the extent Ingram was acting as Engels's agent, Ingram owed a duty to Engels subject to the parties' agreement:

> Subject to any agreement with the principal, an agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents in similar circumstances. Special skills or knowledge possessed by an

> agent are circumstances to be taken into account in determining whether the agent acted with due care and diligence. If an agent claims to possess special skills or knowledge, the agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents with such skills or knowledge.

Restatement (Third) of Agency § 8.08, at 343.

"Whether the agency exists and its extent are questions of fact." *Fowler v. Berry Seed Co.*, 248 Iowa 1158, 1165, 84 N.W.2d 412, 416 (1957); *see also Peak v. Adams*, 799 N.W.2d 535, 546 (Iowa 2011) ("Agency is generally a question of fact."); *Mayrath v. Helgeson*, 258 Iowa 543, 547, 139 N.W.2d 303, 305–06 (1966) ("[U]sually the nature and extent of the authority of an agent, and whether his acts or contracts are within the scope of his authority, are questions of fact . . . ."). While the existence of *some* agency relationship is not contested by the parties, the scope of that relationship is. Ingram and Baird argue Ingram was merely a securities registered representative—only able to "give incidental advice to retail investors who buy and sell securities." They claim Ingram never acted in the role of an estate planner or financial planner for Engels.

The plaintiffs allege Ingram's relationship with Engels far exceeded the scope of the typical relationship between a securities registered representative and his or her client. They argue Ingram was intimately involved with Engels's estate planning and, in fact, gave estate planning advice.

We believe the summary judgment record supports a conclusion that Ingram did far more than just recommend financial investments. Ingram worked with Engels's previous attorney when the Revocable Trust and the Charitable Foundation were established. He became a director of the Charitable Foundation. He was Engels's designated successor as

the trustee of the Revocable Trust. He was the executor of Engels's original will.

Ingram and Engels discussed the terms of Engels's new will and Charitable Trust before they were drafted. According to Tarbox, Ingram spoke with Tarbox three or four times and "outlin[ed] a plan" for Engels's estate before Engels had his first and only meeting with Tarbox. Ingram communicated to Tarbox the parties whom Engels wished to benefit under the Will and Charitable Trust. Ingram was to be the executor of the Will if Jerri McLane could not serve. Ingram was named cotrustee of the Charitable Trust. Ingram repeatedly wrote Engels providing forms for him to transfer the ownership of his assets to the Charitable Trust. As Ingram said to Engels, "We really need to get the [C]haritable [T]rust funded."

Even though Ingram was not licensed to provide legal services, he had a general legal duty to exercise care in whatever services he did provide as Engels's agent. *See* Restatement (Third) of Agency § 8.08, at 343 ("If an agent claims to possess special skills or knowledge, the agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents with such skills or knowledge.").

> If an agent undertakes to perform services as a practitioner of a trade or profession, the agent "is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities" unless the agent represents that the agent possesses greater or lesser skill.

*Id.* cmt. *c*, at 346 (citing Restatement (Second) of Torts § 299A, at 73 (1965)).

A reasonable fact finder could conclude that Ingram was acting on Engels's behalf in developing and implementing an estate plan. Even if Ingram fell short of actually performing legal services, a fact finder could

certainly determine that Ingram was serving as Engels's go-between or intermediary with Tarbox. If Ingram failed to perform these services with due care, he could potentially be liable to Engels or his estate. *See Collegiate Mfg. Co. v. McDowell's Agency, Inc.*, 200 N.W.2d 854, 857 (Iowa 1972) ("Generally an agent owes his principal the use of such skill as is required to accomplish the object of his employment. If he fails to exercise reasonable care, diligence, and judgment in this task, he is liable to his principal for any loss or damage occasioned thereby."); Restatement (Second) of Torts § 874, at 300 (1979) ("One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation.").

But, of course, neither Engels nor his estate is bringing this action. The plaintiffs, rather, are putative beneficiaries of the Will and the Charitable Trust. Yet, we have previously recognized that "a lawyer owes a duty of care to the direct, intended, and specifically identifiable beneficiaries of the testator as expressed in the testator's testamentary instruments." *Schreiner*, 410 N.W.2d at 682. In *Schreiner*, a lawyer drafted a will and a codicil that devised a one-half interest in certain real estate to Schreiner. *Id.* at 680. Later, in the course of representing the same client, the attorney brought an action for partition by sale of the same piece of real estate. *Id.* As a result of the partition sale, the client received cash. *Id.* When the client later died, Schreiner's interest was found to have adeemed because the testator no longer owned the real property. *Id.* The money from the sale did not go to Schreiner, but passed to the testator's family through a residuary clause in the codicil to the will. *Id.* Schreiner brought an action for professional negligence against the attorney, who in turn argued that he owed no legal duty to Schreiner. *Id.* at 681.

While we recognized that an attorney traditionally was considered to owe a duty of care only to his or her client, we noted the trend in other states had been "to allow some relaxation of the privity standard in severely limited situations." *Id.* Consistent with that trend, we found a duty could be owed to "direct, intended, and specifically identifiable beneficiaries of the testator as expressed in the testator's testamentary instruments." *Id.* at 682. We further confined the duty by stating an action

> ordinarily will arise only when as a direct result of the lawyer's professional negligence the testator's intent as expressed in the testamentary instruments is frustrated in whole or in part and the beneficiary's interest in the estate is either lost, diminished, or unrealized.
>
> If the testator's intent, as expressed in the testamentary instruments, is fully implemented, no further challenge will be allowed.

*Id.* at 683 (citations omitted).

Under the facts of the *Schreiner* case, we determined the lawyer was "actively involved in [the will, codicil, and sale of the property] and [was] fully aware of [the client's] intent to leave Schreiner an interest in the property." *Id.* However, the lawyer never explained to the client "what effect the sale would have on her testamentary intent or redrafted her codicil to insure Schreiner would receive a portion of the proceeds from the partition sale," and as a result, nothing passed to Schreiner under the will. *Id.* While we stated that "in most cases, the post-will disposition of property will give rise to no cause of action" because "[n]o lawyer reasonably can be expected to keep track of the provisions in the wills of his or her clients, nor the effect on those instruments caused by changes in the clients' affairs," we determined Schreiner had alleged sufficient facts to avoid dismissal. *Id.*

We also emphasized that allowing a cause of action in these circumstances made sense because "the testator's estate generally will have little incentive to challenge the lawyer's action." *Id.* at 682. In effect, we allowed the intended beneficiary of the testator's written instrument to step into the testator's shoes. *See* Restatement (Third) of the Law Governing Lawyers § 51 Reporter's Note cmt. *f*, at 370 (2000) (citing *Schreiner* as an example of "[a] nonclient enforcing duties of a lawyer to a client").

The duty we imposed in *Schreiner* was extended in *Holsapple v. McGrath* to include the specifically identifiable beneficiaries of nontestamentary instruments. 521 N.W.2d 711, 713–14 (Iowa 1994). The *Holsapple* plaintiffs filed suit against an attorney after a quitclaim deed drafted by the attorney was found to be defective because it had not been properly notarized. *Id.* at 712. Under the quitclaim deed, the Holsapples were to receive certain farmland. *Id.* The grantor–decedent had discussed with her attorney her intent to give the land to the Holsapples and signed the quitclaim deed before her death. *Id.* We applied the reasoning from *Schreiner* and found the Holsapples, despite their lack of an attorney–client relationship with the attorney in question, could recover if they established they were "specifically identified, by the donor, as an object of the grantor's intent" and "the expectancy was lost or diminished as a result of professional negligence." *Id.* at 714. Again, the plaintiff would have to show that the client "attempted to put the donative wishes into effect and failed to do so only because of the intervening negligence of a lawyer." *Id.* at 713.

We again relied on the *Schreiner* decision in *Pitts*, where we found a life insurance agent owed a duty under certain circumstances to the intended beneficiary of a life insurance policy. *Pitts*, 818 N.W.2d at 101–

06. In that case, a widow filed an action against her late husband's insurance agent, claiming the agent negligently failed to cause her to be named the sole beneficiary of her husband's life insurance policy. *Id.* at 95–96. The husband's daughter from a prior marriage had been a partial beneficiary of the policy, but the child support obligation had expired a few years before the husband's death. *Id.* at 95. In answering the question of whether the agent owed a duty to the widow, we indicated "any duty . . . owed . . . would arise out of [the] agency relationship as insurance agent, insured and intended beneficiary." *Id.* at 99.

We first looked at the widow's claim that the relationship of an insurance agent to a beneficiary of a life insurance policy was analogous to the relationship between an attorney and the beneficiary of a testamentary instrument as found in *Schreiner*. *Id.* at 101. In concluding they were comparable, we noted other jurisdictions had accepted the analogy and indicated that "[l]ike a testamentary instrument, the main purpose of the [insurance agent]'s transaction with the insured is to benefit the intended beneficiary." *Id.* at 101–02. We also observed that damage to an intended beneficiary was foreseeable, and if the beneficiary could not bring a claim, "the very purpose for which the insurance agent was employed would be frustrated." *Id.* at 102. Ultimately, we held an insurer owes a duty to the beneficiary if the beneficiary can "show that he or she was the 'direct, intended, and specifically identifiable beneficiar[y]' of the policy as well as the other elements of negligence." *Id.* at 106 (quoting *Schreiner*, 410 N.W.2d at 682). We stated, however, that the beneficiary must "point to evidence in the written instrument itself that identifies her as the intended beneficiary of the entire policy." *Id.* at 109.

The present question is whether a financial planner should be treated similarly to an attorney or an insurance agent. That is, if a written instrument executed by the deceased principal specifically identifies the plaintiff as an intended beneficiary, but due to the agent's negligence the decedent's plan as set forth in the instrument is defeated, can the beneficiary sue? We see no reason to treat one kind of agent differently from another, so long as the plaintiffs are "direct, intended, and specifically identifiable beneficiaries." *Schreiner*, 410 N.W.2d at 682.

Logic and fairness support this result. Both Tarbox and Ingram were involved with Engels's estate plan, but their respective roles are disputed. As we have discussed above, within the scope of their respective agencies, both Tarbox and Ingram generally owed duties of due care. *See F.W. Myers & Co. v. Hunter Farms*, 319 N.W.2d 186, 188 (Iowa 1982) (stating that if an agent "fails to exercise reasonable care, diligence, and judgment under the circumstances, he is liable to his principal for any loss or damage resulting"). It seems appropriate to allow the fact finder to sort out the parties' (including Engels's) respective shares of responsibility.

Baird acknowledged at oral argument that this would be a different case if Ingram had been licensed as an attorney or a certified public accountant. To some extent, this concession undermines Ingram and Baird's position, because the lack of a professional license is not generally viewed as a stop sign for legal liability. *See* Sande L. Buhai, *Act Like a Lawyer, Be Judged Like a Lawyer: The Standard of Care for the Unlicensed Practice of Law*, 2007 Utah L. Rev. 87, 88 (noting that "[a] majority of courts have held that one who provides legal services, regardless of whether licensed or authorized, should be held to the standard of care applicable to attorneys providing those same services");

*see also Buscemi v. Intachai*, 730 So. 2d 329, 330 (Fla. Dist. Ct. App. 1999) (affirming a negligence award against a financial planner and stating that "[a]ppellant overlooks the fact that whether a lawyer or not, if he undertakes to give legal advice, he is subject to a standard of due care").

Under the Will, plaintiff Steve Bristol was clearly a direct, intended, and specifically identifiable beneficiary. The Will provided that Bristol would receive Engels's house. This game plan was confirmed by Tarbox's contemporaneous September 2003 letter to Engels, as well as by Ingram's handwritten summary prepared shortly after Engels's death in February 2006. A reasonable fact finder could determine that Bristol's inheritance was defeated because Ingram did not tell Tarbox the home was already titled in the Revocable Trust.

We do not prejudge the outcome of this case. The ultimate question is whether Ingram or Tarbox breached a duty to Engels, thereby causing Bristol to lose his specifically identified inheritance. There are potential issues of fact as to what Engels, Ingram, and Tarbox said to each other, as to the scope of Ingram's agency and whether it included the communication of information to Tarbox, and as to whether Tarbox had an independent obligation to ascertain the ownership of house.[8]

Moreover, an agent's duties may be affected by an agreement between the agent and the principal. *See Collegiate Mfg. Co.*, 200 N.W.2d at 857 ("This general rule may be altered, either to limit or enlarge the ordinary duties, by agreement of the parties."); *see also F.W. Myers & Co.*, 319 N.W.2d at 188 ("[u]nless otherwise agreed" (internal quotation

---

[8]We also do not address whether Baird is liable for Ingram's actions under respondeat superior, a matter that is not before us.

marks omitted)); Restatement (Third) of Agency § 8.08, at 343 ("Subject to any agreement with the principal . . . ."). In *Pitts*, we pointed out that "the agency agreement had not been modified"; hence, the insurance agent owed "the use of such skill as is required to accomplish the object of his employment." *Pitts*, 818 N.W.2d at 100 (internal quotation marks omitted). As in *Pitts*, no such agreement is before us. *See id.*

For the foregoing reasons, we hold that when an agent negligently performs his or her duties to a principal, and as a result of that negligence a direct, intended, and specifically identifiable beneficiary of a written instrument executed by the principal does not receive the benefits set forth in the written instrument, the beneficiary is owed a duty by the agent and may have a cause of action against him or her.

We conclude, therefore, that the district court should not have entered summary judgment against Bristol based on the absence of a legal duty. For reasons that we discuss below, however, it is unnecessary for us to decide whether St. Malachy's or the United Way were also direct, intended, and specifically identifiable beneficiaries that were owed a similar duty by Ingram and Baird.

**B. Economic Loss.** Ingram and Baird argue, alternatively, that the damages sought by all plaintiffs in the case, including Bristol, are "merely for money damages against a non-professional" and are barred by the economic loss doctrine.[9]

---

[9]Because the district court granted summary judgment to Ingram and Baird based on the absence of a legal duty, it did not need to reach their alternative arguments that summary judgment should be granted based on the economic loss rule, lack of standing, and speculative damages.

However, these arguments were raised below and are reiterated in Ingram and Baird's briefing to this court. It is well-settled that we may affirm a district court ruling on an alternative ground provided the ground was urged in that court. *See Bagelmann*

"As a general proposition, the economic loss rule bars recovery in negligence when the plaintiff has suffered only economic loss." *Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 503 (Iowa 2011). In part, this rule is intended to prevent the "tortification of contract law." *Id.* It is also intended to encourage parties to enter into contracts and to protect parties from being responsible for remote economic losses. *Id.* at 503–04.

However, we have also stated the economic loss doctrine is subject to qualifications:

> For example, purely economic losses are recoverable in actions asserting claims of professional negligence against attorneys and accountants. Also, negligent misrepresentation claims fall outside the scope of the economic loss rule. In addition, when the duty of care arises out of a principal-agent relationship, economic losses may be recoverable.

*Id.* at 504 (citations omitted).

Here, any duty owed to Bristol arises out of the principal–agent relationship between Ingram and Engels. Unless Ingram breached a duty to Engels as Engels's agent, Bristol can have no claim against Ingram. Therefore, Bristol's claims fall under the third recognized exception: losses arising out of a principal–agent relationship. *Id.* As a result, the economic loss rule does not apply.

**C. Damages.** The defendants argue that even if a duty was owed to the plaintiffs and the economic loss rule does not apply, St. Malachy's and United Way lack standing, and their claimed damages are too

---

*v. First Nat'l Bank*, 823 N.W.2d 18, 32 (Iowa 2012); *DeVoss v. State*, 648 N.W.2d 56, 61 (Iowa 2002).

speculative.[10] We will focus our discussion only on the question of damages. The defendants maintain that the amount of any gift to either of these entities was in the full control and discretion of the Charitable Trust's trustees and, therefore, a matter of guesswork. They contend that St. Malachy's and United Way could have received little or nothing, and there is no reasonable way to estimate what they would have received.

"As a general rule, the party seeking damages bears the burden of proving them; if the record is uncertain and speculative as to whether a party has sustained damages, the factfinder must deny recovery." *Data Documents, Inc. v. Pottawattamie Cnty.*, 604 N.W.2d 611, 616 (Iowa 2000). "There is a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages." *Pavone v. Kirke*, 801 N.W.2d 477, 495 (Iowa 2011) (quoting *Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 309 (Iowa 1998)). "[I]f the uncertainty merely lies in the amount of damages sustained, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated." *Id.* (citation and internal quotation marks omitted). "Thus, some speculation on the amount of damages sustained is acceptable," but a plaintiff cannot recover overly speculative damages. *Id.*

The terms of the Charitable Trust provided:

> On the death of the Grantor [Engels], the Trustee shall distribute the net income and so much of the Trust principal as the Trustee may determine among St. Malachy's Catholic Church, Geneseo, Illinois, and the United Way and the

---

[10]The defendants raise lack of standing and speculative damages only as to St. Malachy's and United Way, not as to the Bristols. Engels's home was specifically devised to Steve Bristol in the Will.

American Red Cross, with direction that distributions to the latter two organization[s] shall be used for the benefit of residents of Henry County, Illinois, and to such other 501(c)(3) organizations benefitting Henry County, Illinois as may apply for distributions and which the Trustee, in its sole discretion, determines appropriate in any given year.

The Grantor recognizes that he is placing a good deal of discretionary power in the Trustee, and is confident that the Trustee will exercise its discretionary power in a manner that will best meet[] the needs of the charitable organizations named herein, Geneseo, Illinois and Henry County, Illinois over the years.

Moreover, if either of the trustees—Ingram or Jerri McLane—died or became unable to serve, the Trust assets would go to the Geneseo Is For Tomorrow (GIFT) Community Foundation, with the remaining trustee "to serve in assisting the GIFT Board of Directors in determining distributions from the Trust in a manner consistent with [the above]." Ingram, as we know, died in 2011, so at that point, the Trust assets would have gone to GIFT with Engels's niece McLane "to serve in assisting" GIFT. The decision maker would have been the GIFT Board, with only input from McLane.

We believe the essentially unbridled discretion of the trustees or GIFT to select charitable recipients within a particular geographic area makes the fact and amount of damages too speculative for either St. Malachy's or United Way to recover. *See Giambrone v. Bank of N.Y.*, 677 N.Y.S.2d 608, 610 (App. Div. 1998) ("[T]his claim and the plaintiff's claim of fraud against the Adamo defendants must fail because the damages sought are speculative and incapable of being proven since they are based on the terms of the single-life trust, which provided that the plaintiff's right to income was at the sole discretion of the trustees."); *Pietz v. Toledo Trust Co.*, 577 N.E.2d 1118, 1122 (Ohio Ct. App. 1989) (finding damages too speculative when sons would not receive benefit

under the trust until the mother's death, and mother could use and exhaust assets before that time, potentially leaving them nothing).

We have rejected damage claims in the past when they were too speculative. In one case, we upheld a district court ruling barring anesthesiologists from recovering damages after the expiration date of a contract even though the contract provided it "shall" renew unless terminated by either party. *Tredrea v. Anesthesia & Analgesia, P.C.*, 584 N.W.2d 276, 288 (Iowa 1998); *see also Data Documents, Inc.*, 604 N.W.2d at 617 (finding that damages were too speculative where the plaintiff established only the unpaid contract price but did not present proof on the market price of the goods it had produced or the expenses saved from the defendant's breach); *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 641 (Iowa 1996) (finding damages too speculative when the plaintiff "produced scant evidence to establish the reduction in value" of the property in question); *Mood v. Van Wechel*, 402 N.W.2d 752, 758 (Iowa 1987) (finding insufficient evidence to support a claim for damages where there was no showing of the value of the damaged crops); *Schiltz v. Teledirect Int'l, Inc.*, 524 N.W.2d 671, 674–75 (Iowa Ct. App. 1994) (finding that the landlord's claim of damages against a tenant for unpaid electrical charges was too speculative when the lease required the tenant to compensate the landlord for certain electrical use but "[i]nsufficient evidence was provided from which the trial court could adequately determine the amount of electricity expenses which [the defendant] should pay"). Here, whether or not St. Malachy's and United Way would have received anything and in what amounts was completely up to the discretion of the trustees.

St. Malachy's only response is to refer us to Ingram's August 2006 letter to the church, which enclosed a donation to cover the cost of the

Engels's funeral lunch.[11]  The letter did say that Engels's "intentions were to remember St. Malachy's in a significant manner."  But, "significant" is not exactly a term of precision, and more importantly, nothing would have constrained the trustees of the Charitable Trust or GIFT from bestowing the Charitable Trust assets on other charities to the exclusion of St. Malachy's.  The Charitable Trust document itself provides that "[t]he Grantor recognizes that he is placing a good deal of discretionary power in the Trustee[s]."

In short, we believe the evidence here is insufficient to establish either the fact of damage or a reasonable basis from which damages can be inferred or approximated.  *See Pavone*, 801 N.W.2d at 495.  We note that none of the parties have cited comment *f* to Restatement (Second) of Torts section 912 ("Certainty"), which gives the example of a person who

> is in a class of beneficiaries, one of whom would have received a gift but for the wrongful conduct and there is no evidence to indicate which one would have been the recipient.  In these cases the injured person, in order to recover, has the burden of proving that the gift would have been made to one of the class; having satisfied this burden, he is then entitled to receive an amount commensurate for the chance that he had of receiving the gift.

Restatement (Second) of Torts § 912 cmt *f,* at 486.  Comment *f* thus appears to allow one out of a "class of beneficiaries" to recover a percentage of the whole based on "the chance . . . of receiving the gift." *See id.*  The problem with applying comment *f* here, however, is that there is no confined "class of beneficiaries."  *See id.*  Potentially, the income and principal of the Charitable Trust could have been distributed to any number of "501(c)(3) organizations benefitting Henry County,

---

[11]United Way does not respond to Baird and Ingram's argument that the damages it seeks are too speculative.

Illinois as may apply for distributions." Thus, there is no reasonable basis for awarding damages in favor of St. Malachy's or United Way without requiring the fact finder to speculate as to the trustees' or GIFT's future discretionary actions.

**V. Conclusion.**

For the foregoing reasons, we reverse the summary judgment entered for defendants Ingram and Baird on the claims of plaintiffs Steve and Conni Bristol but affirm the summary judgment entered against plaintiffs St. Malachy's and United Way. We remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Waterman, J., who takes no part.