# IN THE COURT OF APPEALS OF IOWA

No. 15-0601
Filed January 13, 2016

**GEHRKE, INC.,**
　　　Plaintiff-Appellee,

**vs.**

**STEEPLE CHASE FARMS, LLC
and THE NEW MODERN
CONCEPTS, INC.,**
　　　Defendants-Appellants.
_____

**STEEPLE CHASE FARMS, LLC
and THE NEW MODERN
CONCEPTS, INC.,**
　　　Counterclaim-Plaintiffs,

**vs.**

**GEHRKE, INC.,**
　　　Counterclaim-Defendant.
_____

Appeal from the Iowa District Court for Hardin County, Kurt L. Wilke, Judge.

A property owner and a general contractor appeal the district court's ruling in favor of a subcontractor. **AFFIRMED.**

Brian Rickert, Michael R. Blaser, and Brant D. Kahler of Brown, Winick, Graves, Gross, Baskerville & Schoenebaum, P.L.C., Des Moines, for appellants/counterclaim appellants.

Stephen E. Doohen of Whitfield & Eddy, P.L.C., Des Moines, for appellee.

Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

A hog confinement facility under construction in Hardin County incurred damage to its concrete manure pits following heavy rains over Memorial Day weekend in 2013. The facility's owner and a general contractor[1] brought claims against the excavation subcontractor for negligence, breach of contract, breach of express and implied warranties, indemnification and contribution, and unjust enrichment. The district court, recognizing the plaintiffs alleged five counts, found "the sum total" of their claims came "down to a question of negligence." The court decided if the plaintiffs were unable to establish negligence on the part of the subcontractor "then all of their theories fail." The court ruled the subcontractor was not negligent and dismissed the other four claims. On appeal, the plaintiffs contend the record lacks substantial evidence to support the court's determination the subcontractor was not negligent. They also contend the court erred in dismissing the other four claims "for failure to prove negligence" without providing a more detailed analysis.

Because substantial evidence underpins the court's finding the subcontractor was not negligent and because the same allegations of negligent workmanship form the basis for the plaintiffs' other claims, we affirm.

I.      **Background Facts and Proceedings**

*Construction*. Farmer Steve Liston contacted Iowa Select Farms, a pork production company based in Iowa Falls, about selling a parcel of his land for a

---

[1] Steeple Chase Farms, LLC and New Modern Concepts, Inc. were the defendants in the original mechanic's lien foreclosure action brought by Gehrke, Inc., but it is their counterclaims at issue on appeal. We will refer to them jointly as the plaintiffs or as New Modern unless a specific designation to Steeple Chase is warranted.

hog confinement facility. In return for the land sale, Liston wanted a manure easement for crop fertilizer. Liston negotiated the deal with William Foley, Iowa Select's chief financial officer. Foley also manages Steeple Chase Farms, a single member L.L.C. owned by Jeffrey Hanson, Iowa Select's chief executive officer. Hanson's wife, Debora, owned New Modern Concepts, Inc., which acted as the general contractor on construction projects undertaken by Steeple Chase.

Steeple Chase bought a rectangular 4.5 acre lot from Liston located near Owasa and bordering the south side of county road D-35. Foley submitted plans for a two-building, 4800-head hog confinement to Hardin County and the Iowa Department of Natural Resources (DNR). Foley testified obtaining a permit was not an "in-depth process." Foley planned to situate rectangular hog buildings lengthwise, west to east, eighty feet apart. Foley placed the western sides of the buildings one hundred feet from the west lot line and the eastern sides sixty feet from the east lot line. Foley, who did not obtain site elevations before planning the layout, located the driveway on the west side. Liston's corn bins were west of the hog facility's lot line.

After Foley submitted his proposal, the county informed him the county intake tile was located in the ditch on the south side of D-35 and north of the proposed north building. The county tile line ran under the center of the proposed confinement buildings before exiting in the southeast corner of the lot. The county required Steeple Chase to reroute the county tile so it did not run under the new buildings. Steeple Chase received the necessary approvals to go forward.

The diagram below illustrates the facility plan Foley created.



The Owasa lot also contained farm tile lines running north/south through the lengths of both buildings. Foley did not know the Owasa site contained tile lines. Foley testified an excavator generally would reroute smaller diameter farm tile as a part of its overall bid, but he expected to pay extra if an excavator had to reroute a county tile line due to its larger diameter. Foley also expected the

excavator to look at the topography in advance and determine how to dig and where to pile the over-dig or spoils.

New Modern, the general contractor, did not perform any of the construction itself; it hired experienced subcontractors. Adjacent landowner Liston recommended Foley use Gehrke, Inc. for the excavation because its owner, Steve Gehrke, had done previous drainage projects for Liston. Foley contacted Gehrke for help in locating the county tile. Thereafter, Foley solicited a bid from Gehrke, who had extensive experience in digging manure pits. In Gehrke's twenty-eight years as an excavation contractor, he had dug pits for roughly 800 to 1000 confinement buildings, including past work for New Modern.

Gehrke kept a map of the drainage tiles on Liston's farm because he had completed tile work for Liston. In general, surface water flowed across the Steeple Chase lot from the southwest corner toward the northeast corner. Based on the map showing numerous tiles in a cross-hatch pattern on the acreage sold to Steeple Chase, Gehrke knew the lot was wet ground.

In April 2013, shortly after New Modern told Gehrke the driveway would be located on the west side of the lot, Gehrke submitted a written quote to the general contractor for $34,500 in excavation services (manure pits under each building, including rough and final backfills and rock spreading) and for $5200 to reroute the county tile. On April 25, 2013, New Modern accepted Gehrke's written offer by issuing a purchase order to Gehrke detailing those items and agreeing to pay the prices Gehrke quoted. The purchase order also asked Gehrke to install a silt fence for $1060 and provide rock for $2878.84. Gehrke

agreed and did so. New Modern contends Gehrke's April bid and its purchase order constitutes the parties' contract.

Gehrke ran site elevations on the lot before digging and learned the ground one hundred feet to the east of the southwest corner was slightly more than two feet higher than the ground at the southwest corner. He concluded the "water naturally drains to the west on the south side of the property for the first hundred feet. And then after that, the water goes to the east." Gehrke also learned the east end of the site was higher; therefore, more water would be running on the west end of the site.

Gehrke started work in late April. A few days into his work, Gehrke asked New Modern's site manager Darrell Hunt if the driveway could be moved to the east side of the buildings. Hunt knew the east side was higher, did not disagree with Gehrke's idea, and passed the request on to Foley. Hunt did not ask Liston if moving the driveway to the east was possible. Based on the flow of surface water shown by his elevations, in Gehrke's opinion the driveway and truck access on the east end of the lot "would have been much better for this site." Specifically,

> [They could] flip flop the distance they bought from Steve Liston, take 100' off the east end, and move the 60' . . . to the west end. They wouldn't have been buying any more acres total. It would have been a much better way to deal with the water problems.

Foley declined Gehrke's request to move the driveway, which would have required him to resubmit the plans and likely would have resulted in a delay. Foley testified he understood, based on his observations of the site, "the area on the east side would be higher in elevation than the area on the west side where

the driveway entrance now existed." But Foley also knew Liston was happy with Foley's layout because Liston "wanted the driveway where I show it in the diagram because it would give him an additional route into his bin site. That's part of what went into the thought process."

So the driveway remained on the west side of the lot, turning east to run between the buildings. During Gehrke's exploration to locate existing tiles, he dug on the north side of the north building and on the south side of the south building. During his tile exploration, Gehrke "disturbed" the soil in those areas so it was no longer the "virgin ground" needed to support cement trucks. In fact, one cement truck that attempted to pour from the north got stuck up to its axle and had to be pulled out. Gehrke reinstalled the county tile along the east end of the lot. Before he dug the hole for the north pit, Gehrke installed a discharge tile from the north pit to the county intake to "take care of water" that would run into the hole for the pit and "to help drain the site." Expert witness Jason Kreft, the excavation subcontractor New Modern usually hired, was not critical of Gehrke running this tile line to keep the north pit dry.[2]

Gehrke and Hunt both recalled meeting at the site and discussing the location of the excavation spoils. According to Gehrke, when Hunt asked what

---

[2] New Modern expected and hired Gehrke to come back to the site to do backfill and the final grading after other subcontractors had completed their work. Gehrke testified he planned to return after the buildings were poured and hook the discharge tile to the "Form-A-Drain pipe" or tile line that the concrete subcontractor was responsible for placing around the buildings. While Gehrke did not tell anyone from New Modern "to turn the switch off in the intake so that it wouldn't backflow," Gehrke was not on the site during the time of the rain, and the concrete subcontractor had finished pouring the buildings. On the existing record, we are unable to conclude Gehrke's action regarding the discharge tile was somehow improper.

Gehrke was doing, Gehrke explained: "We can't get trucks on the north and south side because I disturbed them all" in locating tile and rerouting the farm tile and the county tile. "The [virgin soil in the] center is the only thing left to do." Gehrke stated he needed to shove the spoils on the east lot area so the trucks could access the lot through the driveway on the west. Gehrke testified Hunt did not disagree or voice any concerns about that plan. According to Hunt, although he had concerns about Gehrke piling dirt on the east, Gehrke had explained that "was working the best for him on the way it laid." Hunt relied on Gehrke's expertise, and Hunt did not push the issue.

On cross-examination Hunt testified, if an excavation subcontractor was doing something Hunt knew was "not going to work" or did not meet DNR requirements, Hunt would bring the matter to the subcontractor's attention and either force the subcontractor to do it correctly or "kick him off the job." Thus, it is undisputed Gehrke chose where to put the excavation spoils based on the land's elevations, the driveway location, and the cement trucks' need for "virgin" ground. It is also undisputed Hunt did not object or require Gehrke to move the spoils to a different location before allowing the concrete subcontractor to perform its work.

As part of his excavation contract, Gehrke rerouted the existing south tiles into a new main tile he installed south of the south building. Gehrke created an intake for the new south main on the southwest side of the south building. Gehrke piled the spoils as discussed with Hunt—along the south and north lengths of the south building area, along the east side of the lot, and on the northeast length of the north building. Because the cement trucks needed

access to the west driveway, Gehrke did not place any spoils on the west side of the lot.

Gehrke finished excavating the pits in the first week of May 2013. Thereafter, Hunt arranged for Alewelt Inc., the concrete subcontractor, to pour the foundations. Alewelt poured the south building first and finished the north building on the Wednesday or Thursday before Memorial Day. No other subcontractors had yet performed work on the buildings.

Nine inches of rain fell on Sunday and Monday of the holiday weekend. Foley observed the site on Tuesday. The rainstorm had not damaged the south building's concrete, and the south building held eight to twelve inches of water in its pit, consistent with the rainfall totals. But the north building's pit was infiltrated and flooded with three to four feet of water, an amount inconsistent with the rainfall totals. Excess water caused the north building to "float" and the concrete to crack.

After the rain storm, New Modern paid Gehrke $22,500. New Modern hired Alewelt to tear out and replace the north building's cement at a cost of $78,597.86. Alewelt finished in mid-June 2013. Gehrke submitted a bill for $8715 to New Modern in August 2013. A few days later, New Modern's attorney sent a demand letter to Gehrke, stating New Modern had suffered about $100,000 in damage to the north pit, and based on its investigation, "the north barn was not sufficiently bermed, as the south barn was, to avoid water from infiltrating the pit."

***Bench Trial.*** Gehrke filed a mechanic's lien, and New Modern answered and filed counterclaims alleging negligence, breach of contract, breach of express and implied warranty, indemnification/contribution, and unjust enrichment. The parties settled the lien dispute, and the district court held a bench trial on New Modern's five counterclaims in February 2014. Because New Modern raises a substantial-evidence challenge on appeal, we discuss the trial testimony in some detail.

Foley testified Hunt coordinated the subcontractors to keep the project moving, and New Modern expected Hunt to be on the project site at least once a week. Foley explained that New Modern, as the general contractor, had "the ultimate responsibility to the customer," here Steeple Chase. But Foley "still expect[ed] the subs to perform their various tasks in a workmanship like manner." Foley testified New Modern expected the excavator to account for the water flow on the site and keep water out of the pits. Despite not taking elevations, Foley believed the water flow on the lot was obvious, running from the southwest directly to the west end of both hog barns.

On the Tuesday morning after the rainstorm, Foley noticed Gehrke had not placed "any berm or build-up of dirt around the north pit" to prevent water from getting into the north pit. Foley believed blocking the east side of the lot with spoils "clearly impeded" the "water's ability to flow on out." Foley opined, if Gehrke had "not pushed all the dirt to the east end and blocked the natural flow of water, it appears that [damage to the north pit] could have been easily avoided."

On cross-examination, Foley acknowledged he declined Gehrke's request to move the driveway to the east side of the lot due to the probable delay (thirty to ninety days) in completing the project. Foley admitted putting the driveway on the east "possibly" would have changed where Gehrke placed the dirt. Foley also admitted: "Q. If under our hypothetical, the driveway goes on the east side and spoiled dirt is piled on the west side, that . . . would have protected both of these buildings; right? A. If that's how he would have chose to do it."

Foley suggested he had seen other sites where the spoils were piled in the center but admitted he did not know the total width required by the cement trucks to maneuver between the buildings. Foley then suggested if Gehrke had extended the berm on the south side of the south building "just to the west of the south building on the southwest corner of the site, from where the water was flowing" onto the site, those spoils would not have prevented the cement trucks from driving between the bins, but would have protected the north pit. Foley was "fairly certain" his extended-berm solution would not have backed up surface water onto Liston's property. In any event, Foley did not believe a southwest berm that routed the water towards Liston's property was a problem because the water entering Steeple Chase's lot at the southwest corner came from Liston's land and Steeple Chase had no obligation to keep that water on its lot.

On cross-examination, Foley acknowledged that water standing in the north ditch was atypical and resulted from the heavy rains. Foley also admitted the flooded county intake in the north ditch might be higher than Gehrke's discharge tile line in the bottom of the north pit. Based on the amount of rain, it

was possible Gehrke's discharge tile line intended to move water out of the north pit to keep it dry "actually had just the opposite effect." Foley concluded there was no way to determine how much of the water inside the north pit came from the flooded county intake and how much came from the flow of surface water.

Dwaine Bundy, an expert witness for New Modern, opined if Gehrke had properly "bermed up" the outside of the north pit before the concrete construction, "the concrete would not have had to be replaced." Bundy also criticized Gehrke for piling dirt on the east side of the lot. When asked if extending the berm on the south side of the south building further west as proposed by Foley would have helped protect the north pit, Bundy testified "it would," *except for* the water flowing directly east from Liston's grain bin area, "we got to have that coming to the north."

Bundy did not know Gehrke had asked to have the driveway placed on the east side, which would have allowed space for the spoils along the west side of both buildings. When asked whether Gehrke's proposal "wouldn't have been a better outcome in this case given what we know about the slope of the water," Bundy answered it "might have been." When asked whether Gehrke putting a similar size berm around the north pit as around the south pit would have worked, Bundy replied:

> I believe it would, *except the fact the water had to run someplace.* And [the picture] shows the arrow where the water from part of that went to the east. And that part of the water would have not been part of the water up against a berm on the west side or the north side, so that would be the case in this situation.
> Q. So now we'll never know if a berm would have held the water on the north pit because Mr. Gehrke didn't put one in; correct? A. That would be correct.

(Emphasis added.)

New Modern also called Jason Kreft as an expert witness. Kreft was an experienced excavator whose business made a profit doing projects for New Modern, though he testified he was neither being paid nor promised any particular work for providing his opinion. Kreft had concerns about Gehrke piling dirt on the east end because it would "probably catch water . . . if the water got in there, it can't get out." If Kreft had been hired to excavate the Owasa site, he would have piled dirt completely around all four sides of each building and would have had the cement trucks pour from the outside of the buildings, not from a center aisle. But Kreft did not know any details about Gehrke being required to reroute the county tile. On cross-examination, Kreft agreed the Owasa lot was naturally a wet site and acknowledged nine inches of rain falling in a twenty-four-hour period "would be a lot." Kreft agreed it is more difficult for an excavator to handle spoils on a "wet site" because the dirt "sloughs off and doesn't stay in a pile." According to Kreft, if trucks were to drive in the center aisle of a wet site, then the excavator would need to keep the dirt in the center aisle "virgin." Kreft testified, if hypothetically the driveway was placed on the east side so that Gehrke, knowing he did not have to worry about access of trucks on the west side, "piled a windrow of dirt along the west side," the fact of Gehrke "putting dirt on that end" would have "gone a long ways toward protecting the north building."

Michael Tacchia Jr., who poured the concrete, agreed the Owasa lot was a wet site. He testified to needing thirty to forty feet of "virgin" ground to optimally operate his pump truck between the two buildings.

Gabriel Snakenberg, a self-employed excavator who had previously worked for Gehrke, Inc., testified as an expert witness for Gehrke. Snakenberg said an excavator's job is to keep the pit floor dry so the concrete contractor can pour the foundation and to move the spoils so the other contractors can complete the site work. According to Snakenberg, an excavator cannot place the spoils so water is directed onto neighboring property. Snakenberg reviewed Gehrke's elevations and agreed the ground between the two buildings "is lower in the center of the buildings than it is either on the west or east end" by roughly two feet. Snakenberg testified, because the dirt was disturbed to reroute the county tile on the north side of the north building, it was not an option to have concrete pump trucks on the north side of the north building. Snakenberg also testified if Gehrke had added a berm on the north building's south side, the space remaining would not have accommodated the cement trucks. Snakenberg had no problem with Gehrke placing spoils in a windrow on the east side of the property—he "had no more places to go with his spoiled dirt since his property was so tight."

When Gehrke took the witness stand, he acknowledged his company had an obligation to excavate the site in a reasonable manner to prevent the accumulation of water. Gehrke agreed the north building's concrete cracked and had to be replaced. Gehrke explained he did not put spoils along the north building's south length because "water would have ponded" between the buildings as it was "two feet lower in the center." Gehrke testified putting a berm on the north building's south length and cutting a channel to the east would not

have eliminated the pond—the middle's center is ninety-nine feet and the east end is slightly over one-hundred feet—a "foot and a half higher on the east end already, so water could have never flowed to the east." Gehrke testified his elevations showed that even if he had not put spoils on the east, the water would not have flowed through there.

Engineer James Tometich testified on Gehrke's behalf. According to his report, "[W]hen the flood occurred and the county tile could not handle the amount of water, it back flowed into the excavated pits and created" the infiltration of the north pit. Tometich opined the berms that Foley and New Modern's experts suggested Gehrke should have installed on the north pit "would not have been an effective method of controlling the flood waters. The soil was super saturated (full of water) and would not have held up like an earthen dam. The water would have ultimately back-flowed into the excavations through the previously installed tile lines."

Tometich also discussed the roles of general contractor New Modern and its subcontractors.

> A General Contractor (GC) is in charge of the entire job. The GC hires subcontractors to perform many aspects of the work. The GC schedules the work and when one [sub]contractor is complete, the next one comes in and does the next portion. If a subcontractor's work is not done correctly, the GC is responsible for requiring corrections of the work prior to the next contractor coming in. The fact that the concrete foundations were poured on Gehrke's work indicates that the work was complete and acceptable; otherwise the GC would not have let the concrete subcontractor continue their work . . . . It is clear that [Gehrke's] work was accepted by the GC [New Modern].

At the close of the evidence, Gehrke's attorney argued that in New Modern's counterclaims for breach of either contract or warranty, "the breach would be negligence."  Similarly, New Modern's trial brief to the court stated its "counterclaims plead multiple theories of recovery for the *same wrong*; namely, Gehrke's defective work and failures on the site resulted in [New Modern] incurring $78,597.86 in damages to tear out, replace, and re-pour the north building concrete pit."  (Emphasis added.)

***March 2015 District Court Ruling****.*  The district court understood that New Modern advanced five counterclaims, but decided they all boiled down to whether Gehrke fulfilled its obligation to excavate the site in a "reasonable manner."  The court held that if New Modern was "unable to establish negligence on the part of Gehrke, then all of [its] theories fail."

The court specifically found, at the time of the rain storm, there "was no dirt piled on the west or south side of the north building since that was the access area for trucks to get to and between the building sites.  Piling dirt in those locations would have prevented such access."  The court concluded New Modern "failed to establish negligence on the part of Gehrke or that the alleged negligence of failure to extend a berm to the west was a proximate cause of damage" to New Modern.  Specifically, the court found:

> [U]nder the requirements of the job that was presented to Gehrke, it acted reasonably in accomplishing its work.  Due to the shortness of space from the buildings to the western boundary, an extended berm would likely have accomplished nothing except anger the neighbor [Liston].  Further, water backflowing from the ditch into the north building excavation was just as likely to have been the cause of damage as surface water flowing across the property.

New Modern's post-trial motion asked the court to enter specific findings on its four other counterclaims. The court declined, and New Modern timely appealed.

## II.     Standard of Review

New Modern's counterclaims were tried at law. Thus, we review for correction of errors at law, and the district court's findings of fact "shall have the effect of a special verdict." Iowa R. App. P. 6.907. The trial court's findings of fact are binding upon us if supported by substantial evidence. Iowa R. App. P. 6.904(3)(a). We view the evidence in the light most consistent with the court's judgment. *R.E.T. Corp. v. Frank Paxton Co.*, 329 N.W.2d 416, 419 (Iowa 1983). "Our deference to the trial court's finding of facts does not extend to its determinations of law." *Id.*

## III.     Substantial Evidence

New Modern contends substantial evidence does not support the court's determination Gehrke was not negligent. To succeed on its negligence claim, New Modern had to prove "the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages." *St. Malachy Roman Catholic Congregation v. Ingram*, 841 N.W.2d 338, 346 (Iowa 2013). On appeal, this court does not reweigh the evidence to see if it would have reached a different conclusion. *See R.E.T. Corp.*, 329 N.W.2d at 419 ("Evidence can be contradictory and remain substantial."). Here, the fighting issues were whether Gehrke failed to conform to

a standard of care and whether Gehrke's action or inaction in placing the spoils caused the undisputed damages.

The record contains conflicting evidence with both parties presenting expert testimony to support their contentions. The district court believed and credited Gehrke's evidence and rejected some of New Modern's evidence. In our review, we "are keenly aware of the trial court's superior vantage point to make credibility determinations due to its ability to consider firsthand the demeanor and appearance of the parties." *Neimann v. Butterfield*, 551 N.W.2d 652, 654 (Iowa Ct. App. 1996).

Foley and New Modern's experts were critical of Gehrke's excavation process, citing his failure to (1) place berms around the north pit, (2) extend the berm along the south building to the west lot line, and (3) recognize placing dirt along the east would impede water flow. The plaintiffs alleged Gehrke's defective workmanship resulted in the flooding of the north pit. But both the cross-examination of New Modern's witnesses about those alleged failures—as well as the testimony of Gehrke and his witnesses—provided substantial support for the district court's ruling. For instance, New Modern's own expert explained lengthening the south windrow to the west lot line would have done nothing to handle the water entering directly from the west corn bin area. Testimony also made clear such an extension (1) would not have prevented water from flowing around the windrow and onto Liston's land and (2) an excavator is not allowed to place the spoils in a manner that temporarily diverts surface water onto another's property.

The evidence showed Gehrke was working on a tight site; he could not have added a windrow to the north pit's south side and still have left room for cement trucks. Moreover, given Gehrke's undisputed measurements of the site elevations, adding dirt to the south side of the north pit also was not feasible due to the higher elevation on the east side and the lower elevation in the center aisle. Based on these elevations, adding a windrow along the north pit's south side would have caused a two-foot pond to form in the only area for cement trucks access. Finally, the evidence supports the district court's conclusion Gehrke could not place dirt on the west side of the north building due to the driveway access for cement trucks. Accordingly, given this tight lot's elevations and driveway placement, substantial evidence supports the district court's finding Gehrke did not breach a standard of care in regard to the failures claimed by New Modern.

The district court also concluded New Modern failed to prove the causation element of negligence because "water backflowing from the ditch into the north building excavation was just as likely to have been the cause of damage as surface water flowing across the property." Foley's testimony alone, as detailed above, provides substantial evidence to support this conclusion. Further, Foley's testimony is consistent with the views of Gehrke's expert. Accordingly, the district court's ruling on causation is likewise well-rooted in the record.

**IV.    Other Counterclaims**

New Modern contends the district court erred in dismissing its other claims (breach of contract, breach of express and implied warranties, indemnification and contribution, and unjust enrichment) solely on the premise it did not prove Gehrke's negligence.  In a related issue, New Modern argues the court erred in declining to make findings of fact and conclusions of law on its counterclaims other than negligence.  We will address these issues in a combined analysis.

**A.  Error Preservation.**  Gehrke asserts New Modern did not preserve error.  We find no merit to this challenge.  New Modern pleaded the four non-negligence counts in its counterclaim.  Its trial brief listed the elements to be proven in a contract action and provided a general definition of "implied warranty" in construction contracts.  New Modern's motion under Iowa Rule of Civil Procedure 1.904 alleged the court did not rule "on their other four counterclaims" and asked the court to "amend and enlarge its findings and conclusions" in order "to address and rule on each of [its] separate counterclaims."  The district court declined, ruling:

> As stated in this court's ruling, all of the counterclaimants' counterclaims were founded on alleged negligence of [Gehrke]. This court specifically found that counterclaimants failed to prove negligence on the part of [Gehrke].  Having failed to do so, there was no breach of contract, no breach of express or implied warranties, no basis for indemnification or contribution, and no unjust enrichment on the part of [Gehrke].

Thus, the district court *did rule* on the other claims, and error was preserved for appellate review.  *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

**B. Discussion**

New Modern contends the court erred because its other counts require proof of elements distinct from the components of its negligence claim.[3]

*Contract.* The district court determined its finding that Gehrke's actions or inactions did not constitute a failure to meet the standard of care (i.e. Gehrke's workmanship was not defective and it was not at "fault" in tort) also resolved New Modern's claim Gehrke breached their contract. We agree under the specific circumstances of this case. First, New Modern's trial brief stated it was pleading "multiple theories of recovery for the same wrong; namely, Gehrke's defective work and failures on the site." Second, New Modern's evidence cited the same three alleged failures by Gehrke, discussed above in the negligence analysis, as constituting defective workmanship for *all of its claims*.

The court's standard-of-care conclusion in tort was based on its findings (1) "Gehrke acted appropriately in all respects" and (2) "under the requirements of the job that was presented to Gehrke, it acted reasonably in accomplishing its work." The same findings that support the court's conclusion New Modern could not recover for defective workmanship in tort also support the court's conclusion New Modern could not recover for defective workmanship in contract—i.e.,

---

[3] New Modern does not advance a separate argument concerning its counterclaims for indemnification and contribution or unjust enrichment in its appellant's brief. Similar to its trial brief, New Modern discusses those concepts only in parentheticals included in a string of case citations. Because those claims are not separately argued, we decline to consider them on appeal. *See State v. Mann*, 602 N.W.2d 785, 788 n.1 (Iowa 1999) (noting random mention of an issue, without analysis or argument, is insufficient to prompt appellate consideration). New Modern's argument concerning those claims in its reply brief comes too late. *See Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 642 (Iowa 1996) (declining to consider argument raised for first time in reply brief).

Gehrke's work was not defective as alleged by the three specifications of negligence and thus Gehrke did not breach the construction contract. *See Pursell Constr., Inc. v. Hawkeye-Sec. Ins. Co.*, 596 N.W.2d 67, 68 (Iowa 1999) (combining the analysis of tort and contract claims alleging defective workmanship where both claims were based on the contractor's alleged failure to put the basement at the correct level); *McPherrin v. Jennings*, 24 N.W. 242, 243 (Iowa 1885) (recognizing a party's negligent acts in caring for a horse "constitutes a breach of contract, and the [tort] action is based upon this breach"); *see also Hilsman v. Phillips*, No. 08-0289, 2009 WL 249885, at *4 (Iowa Ct. App. Feb. 4, 2009) (recognizing the "same specifications of negligence" claimed by the plaintiff were also the plaintiff's basis for the alleged breach in the contract claim).

As in *McPherrin*, the defective workmanship New Modern alleged constituted "fault" in negligence, i.e. failing to properly berm the site, was the identical workmanship alleged to have breached the contract. *See McPherrin*, 24 N.W. at 244. Although more detail in the court's ruling might have clarified the issues, the district court did not err in summarily concluding New Modern failed to prove Gehrke's defective workmanship constituted a "breach" of the contract.

Additionally, to be successful on its contract claim, New Modern had to prove Gehrke's excavation "caused" the damages. *See Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010). Foley testified it was impossible to determine what damage to the north pit was caused by surface water flowing into the pit and what amount of infiltration was caused by backflow from the north pit discharge tile. We read the district court decision as rejecting

New Modern's position that Gehrke's actions *caused* damage to the property. The court opined the back flow of water from the ditch was "just as likely to have been the cause of damage" as the surface water flowing across the lot. We find the court's conclusion on causation specific enough to be an independent reason for rejecting New Modern's claim Gehrke breached the contract.

***Implied Warranty.*** New Modern raises the same challenge to the court's summary resolution of its claim for breach of the implied warranty of workmanlike construction.[4] New Modern contends Gehrke "breached the implied warranty of workmanlike construction by excavating and grading around a North Building pit that did not stay dry throughout the remainder of the construction process." Gehrke counters that New Modern, as a sophisticated general contractor, is not the kind of party that the implied warranty was intended to protect. *See Rosauer Corp. v. Sapp Dev., L.L.C.*, 856 N.W.2d 906, 910 (Iowa 2014) (holding "the potential class of plaintiffs is limited to innocent homebuyers for whose benefit we created the warranty").

Assuming without deciding that general contractor New Modern can seek to enforce an implied warranty of workmanlike construction against its subcontractor, Gehrke, we find New Modern's implied-warranty claim is defeated by the same failure to show either fault or causation as we discussed in rejecting the breach-of-contract claim.

---

[4] New Modern does not substantively discuss Gehrke's alleged breach of an "express" warranty until its reply brief. Accordingly, we decline to address that issue separately. *See Sun Valley Iowa Lake Ass'n*, 551 N.W.2d at 642.

New Modern contends the district court erred in focusing on whether Gehrke acted reasonably in performing the excavation work, instead of examining the "end result" of his grading. For this contention, New Modern relies on *Reilly Constr. Co. v. Bachelder, Inc.*, No. 14-0817, 2015 WL 1331634, at *1 (Iowa Ct. App. Mar. 25, 2015) (holding contractor's approval of site selection for pond that failed to hold water was a breach of implied warranty of workmanlike construction). Contrary to New Modern's suggestion, *Bachelder* does not stand for the proposition that the implied warranty of workmanlike construction creates an absolute guarantee or strict liability for the excavator's work. In *Bachelder*, we determined the contractor miscalculated the soil conditions before digging and thereby failed to construct a viable pond. *See id.* at *6 (citing *Ideal Heating Co. v. Kramer,* 102 N.W. 840, 840–41 (Iowa 1905)). *Bachelder* did not hold that minus some miscalculation, the contractor would still have breached the implied warranty. Thus, to prove Gehrke breached an implied warranty of workmanlike construction, New Modern must show some miscalculation or faulty work by Gehrke that resulted in the damages, not simply that the pits did not stay dry.

New Modern did not prove Gehrke miscalculated the elevations or the optimal placement of the berms on the hog facility site as it was laid out by Foley nor that such miscalculations resulted in the water damage to the north building. Accordingly, the district court properly dismissed New Modern's warranty claims.

**AFFIRMED.**